In the

# United States Court of Appeals

## For the Seventh Circuit

No. 14-2799

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

DANIEL DVORKIN,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:12-cr-00500-1 — **Edmond E. Chang**, *Judge.*

ARGUED JANUARY 7, 2015 — DECIDED AUGUST 25, 2015

Before RIPPLE, WILLIAMS, and SYKES, *Circuit Judges.*

RIPPLE, *Circuit Judge.* Daniel Dvorkin was convicted on
five counts of using, or causing another person to use, a fa-
cility of interstate commerce with the intent to commit a
murder for hire, in violation of 18 U.S.C. § 1958, and on one
count of soliciting another to commit a crime of violence, in
violation of 18 U.S.C. § 373. He timely appealed his convic-
tions on various grounds. For the reasons set forth in this
opinion, we affirm the judgment of the district court.

## I

## BACKGROUND

### A.

This case arises out of Mr. Dvorkin's failed efforts to hire a hitman to kill a creditor named Larry Meyer. Meyer was the manager of Texas 1845, LLC ("Texas 1845"). In December 2010, Texas 1845 acquired two distressed loans guaranteed by Mr. Dvorkin and his company, Dvorkin Holdings, LLC. Shortly afterward, Texas 1845 filed an action in Illinois state court against Mr. Dvorkin and his company to recover on the debt. On February 26, 2012, the state court entered judgment for Texas 1845 for approximately $8.2 million. On April 2, 2012, the parties attempted, but ultimately failed, to negotiate a settlement of the debt. The judgment became enforceable on May 4, 2012.

### 1. April 5 Voicemail and April 6 Meeting

On April 5, 2012, Mr. Dvorkin called and left a voicemail for Robert Bevis. Bevis owned and operated a firearms store, which had leased space from one of Mr. Dvorkin's companies, Dan Development, LLC ("Dan Development"). Bevis also worked as a private detective and process server. In his voicemail, Mr. Dvorkin identified himself, stated that he "ha[d] an idea," and asked Bevis to call him back.[1]

The next day, Bevis visited the offices of Dan Development. There, Mr. Dvorkin approached him in the reception

---

[1] R.146-1.

area and asked Bevis to accompany him to the parking lot. Once they were alone, Mr. Dvorkin told Bevis that "he had a problem" and handed Bevis a copy of the February 26 judgment in favor of Texas 1845.[2] Mr. Dvorkin stated "that he wanted this guy to stop breathing" and that he was willing to pay $50,000 for Meyer's murder.[3] He then reached into his pocket and brandished a large wad of cash. He explained that he was appealing the judgment and that he could prevail if Meyer were unable to respond.

In response, Bevis told Mr. Dvorkin that he knew someone in Florida who might be willing to accept Mr. Dvorkin's offer. Bevis later testified that this statement was a lie, which he told to end quickly an uncomfortable conversation.

After their conversation, Mr. Dvorkin escorted Bevis back inside Dan Development's offices, where he gave Bevis a printout of Meyer's LinkedIn profile. At the top of the printout was a handwritten note, stating, "Not sure if this [is] your guy!"[4] This note was written by Mr. Dvorkin's administrative assistant, who had printed the profile after Mr. Dvorkin had asked her to find information on Meyer's whereabouts.

Bevis left Dan Development with copies of both the February 26 judgment and Meyer's LinkedIn profile. Later that day, Bevis contacted the Oakbrook Terrace, Illinois, Chief of Police to report his encounter with Mr. Dvorkin. The police,

---

[2] R.174 at 19.

[3] *Id.* at 21.

[4] R.146-9.

in turn, set up a meeting with the FBI. After hearing Bevis's story, the FBI asked Bevis to become a cooperating witness and to record his conversations with Mr. Dvorkin. Bevis agreed.

### 2. April 18 Phone Call and Meeting

On April 18, 2012, at the direction of federal agents, Bevis called Mr. Dvorkin to arrange an in-person meeting. The call was recorded. During the call, Mr. Dvorkin stated that he "still ha[d] that problem" and asked Bevis if he had traveled down to Florida.[5] Bevis responded that he had but that he would prefer to talk about it in person. The two agreed to meet later that day.

During their meeting, which was recorded, Bevis told Mr. Dvorkin that the Florida hitman had offered to kill Meyer for approximately $80,000, half of which he required in advance. Mr. Dvorkin responded that he had $50,000 in untraceable funds and would "have to figure out how to get the rest."[6] After discussing the issue further, Mr. Dvorkin offered to loan Bevis $50,000 on favorable terms if he could negotiate with the hitman to accept $50,000 for killing Meyer. Bevis agreed.

---

[5] R.146-2 at 1.

[6] R.146-3 at 4.

### 3. April 30 and May 3 Phone Calls

On April 30, 2012, Mr. Dvorkin called Bevis and told him "[t]hat he had a different avenue that he may want to take" with respect to Meyer.[7] Bevis testified that he understood this statement to mean that Mr. Dvorkin had "found somebody else to kill Larry Meyer at a cheaper rate than" the fictional Florida hitman.[8] Mr. Dvorkin also told Bevis that his last court date "didn't go well."[9] The two men made plans to speak again soon. On May 3, Mr. Dvorkin called Bevis and made arrangements to meet on May 7.

### 4. May 7 Meeting and Phone Call

On May 7, 2012, Bevis drove to Mr. Dvorkin's office. In a recorded conversation, Mr. Dvorkin elaborated on the "other avenues" that he had mentioned on April 30. He told Bevis that he had hired someone else to kill Meyer for less than half of the price of the Florida hitman and with only a ten-percent down payment. Further, he explained, this other individual had promised to finish the task by Friday, May 18. Consequently, Mr. Dvorkin initially instructed Bevis to discontinue negotiations with the Florida hitman and to "tell him [that] it fell through."[10] After discussing the issue further, however, Mr. Dvorkin instructed Bevis to inquire whether the Florida hitman would accept a lower price and

---

[7] R.174 at 92.

[8] *Id.*

[9] *Id.*

[10] R.146-4 at 2.

to tell him that they had found someone else willing to do the job for $20,000. Bevis agreed to do so.

Later in the day on May 7, Bevis, at the direction of the FBI, called Mr. Dvorkin to report that the Florida hitman would accept the lower price. In response, Mr. Dvorkin explained that his plan to use the "other avenue" hitman was already in motion and that he could not do anything until May 18. The two agreed to discuss the issue again on that date.

Following this call, the FBI placed Meyer and his family under twenty-four-hour surveillance. Further, on that same day, law enforcement officers confronted Mr. Dvorkin in the parking lot outside his office. They told him that they were aware of his plot to kill Meyer and that, if Meyer were harmed, he would be the primary suspect.

### 5. May 8 Meeting

On May 8, 2012, Mr. Dvorkin called and told Bevis that he was on his way to Bevis's gun store. He arrived ten to fifteen minutes later. Their meeting was not recorded. Upon his arrival, Mr. Dvorkin told Bevis that law enforcement had confronted him and had reported that someone had taken "a shot at Larry Meyer."[11] Mr. Dvorkin asked Bevis to search online for news concerning Meyer because he did not want to use his own computer. FBI computer analysts later confirmed that a Google search for Meyer's name was made on Bevis's computer at approximately 10:16 a.m. on May 8.

---

[11] R.175 at 31.

**6. May 11 Phone Call and July 5 Arrest**

On May 11, 2012, Bevis called Mr. Dvorkin to determine whether the FBI's intervention had stymied his plan to use the "other avenue" hitman. Bevis started the conversation, which was recorded, by telling Mr. Dvorkin that the FBI had stopped by his gun store and had questioned him about Mr. Dvorkin. After agreeing on what they would say if confronted by the FBI in the future, Bevis inquired whether Mr. Dvorkin still intended to follow through with his plan to kill Meyer:

> BEVIS: … I mean is, is everything over? Did you, is everything stopped? I mean 'cause if anything does happen—
>
> … .
>
> DVORKIN: As far as I know it's all legal. It's all stopped. I am gonna file, ah, ah, a Chapter 11 reorganization. The only thing I do now is through attorneys and, ah, I don't know this guy, this guy sounds like a nut to me.
>
> … .
>
> DVORKIN: … I'm just gonna get on with my life we're appealing the case.
>
> BEVIS: Yeah.

    DVORKIN: I'm just doin' legal things.[12]

FBI agents arrested Mr. Dvorkin on June 5, 2012.

## B.

In August 2012, a grand jury returned a six-count indictment, charging Mr. Dvorkin with five counts of using or causing another person to use a facility of interstate commerce with the intent to commit a murder for hire, in violation of 18 U.S.C. § 1958, and one count of soliciting another to do the same, in violation of 18 U.S.C. § 373.

Mr. Dvorkin was tried before a jury approximately one year later. During the six-day trial, the Government introduced evidence of the facts just recited. Prior to the submission of the case to the jury, Mr. Dvorkin moved for acquittal. The court denied the motion. Shortly afterward, the jury found Mr. Dvorkin guilty on all counts. Mr. Dvorkin then filed a renewed motion for acquittal and a motion for a new trial. The court denied both motions. Mr. Dvorkin timely appealed.[13]

---

[12] R.146-7 at 4–5.

[13] The district court's jurisdiction was premised on 18 U.S.C. § 3231. Our jurisdiction is secure under 28 U.S.C. § 1291.

## II

## DISCUSSION

Mr. Dvorkin raises four arguments on appeal. He first contends that the evidence of record is insufficient to sustain any of his convictions. Second, he submits that the evidence shows that he had renounced his criminal intent with respect to his solicitation charge and, consequently, that the district court erred in denying his motion for acquittal. Third, he asserts that the court improperly restricted his cross-examination of Bevis. Finally, he contends that the court erred by allowing the Government to make an improper argument during its rebuttal at closing. We address these issues in turn.

## A.

We begin with Mr. Dvorkin's sufficiency of the evidence arguments. *See United States v. Douglas*, 874 F.2d 1145, 1150 (7th Cir. 1989), *abrogated on other grounds by United States v. Durrive*, 902 F.2d 1221 (7th Cir. 1990). "In considering such a challenge, we view the evidence in the light most favorable to the Government, defer to the credibility determination[s] of the jury, and overturn a verdict only when the record contains no evidence, regardless of how it is weighed, from which the jury could find guilt beyond a reasonable doubt." *United States v. Carter*, 695 F.3d 690, 698 (7th Cir. 2012) (alterations omitted) (internal quotation marks omitted).

**1.**

Mr. Dvorkin first challenges the sufficiency of the evidence supporting his convictions under 18 U.S.C. § 1958.[14] As relevant here, § 1958 prohibits traveling in, or using a facility of, interstate commerce, or causing another person to do so, "with intent that a murder be committed … as consideration for a promise or agreement to pay[] anything of pecuniary value." 18 U.S.C. § 1958(a). Mr. Dvorkin's challenge is a focused one. He does not contend that his conduct lacked the necessary connection to interstate commerce,[15]

---

[14] The jury convicted Mr. Dvorkin on each of the five § 1958 counts charged against him in the indictment. Those counts each corresponded to a different "use" of interstate commerce by either Bevis or Mr. Dvorkin. Those "uses" include (1) Mr. Dvorkin's April 5 voicemail for Bevis, (2) Mr. Dvorkin's April 18 telephone call with Bevis, (3) Bevis's April 18 drive to Mr. Dvorkin's office, (4) Bevis's May 7 drive to Mr. Dvorkin's office, and (5) Mr. Dvorkin's May 7 telephone call with Bevis.

[15] The phrase "facility of interstate or foreign commerce," as used in this provision, "includes [both] means of transportation and communication." 18 U.S.C. § 1958(b)(2). Automobiles and interstate telephone carriers are well recognized examples of "facilities of interstate … commerce." *See United States v. Mandel*, 647 F.3d 710, 716, 721 (7th Cir. 2011); *United States v. Richeson*, 338 F.3d 653, 660–61 (7th Cir. 2003). Section 1958 requires only "that the facility, and not its use, be in interstate or foreign commerce." *Richeson*, 338 F.3d at 660. Consequently, a defendant's *intra*state use of a facility of *inter*state commerce is alone sufficient to satisfy the statute's jurisdictional element. *See id.* ("[I]t is sufficient under § 1958 that the defendant used an interstate commerce facility in an *intra* state fashion." (alteration omitted) (emphasis in original) (internal quotation marks omitted)); *Mandel*, 647 F.3d at 721 ("The statute … does not require that a facility of interstate commerce actually be used in interstate commerce.").

nor does he dispute the evidence of his criminal intent.[16] Rather, he submits that the statute requires an additional element, which the Government has failed to prove, namely, that he actually entered into a murder-for-hire agreement. The Government in response submits that § 1958 "does not require evidence of a mutual agreement, but instead requires only that [the] defendant possess [the] 'intent that a murder be committed … as consideration for a promise or agreement to pay.'"[17]

In assessing these positions, we begin, as we always do, with the text of the statute. That provision reads, in relevant part, as follows:

> Whoever travels in or causes another (including the intended victim) to travel in interstate or foreign commerce, or uses or causes another (including the intended victim) to use the mail or any facility of interstate or foreign commerce, with intent that a murder be committed in violation of the laws of any State or the United States as consideration for the re-

---

[16] In his reply brief, Mr. Dvorkin does contend, for the first time, that the evidence of record is insufficient to show that he ever "actually harbored the intent to have Larry Meyer … killed in exchange for something of pecuniary value." Reply Br. 4–5. Because Mr. Dvorkin raised this argument for the first time in his reply brief, we consider it waived. *See United States v. Kennedy*, 726 F.3d 968, 974 n.3 (7th Cir. 2013). Moreover, waiver aside, we note that the evidence of Mr. Dvorkin's criminal intent is more than sufficient to sustain his § 1958 convictions.

[17] Appellee's Br. 33 (third alteration in original) (quoting 18 U.S.C. § 1958(a)).

ceipt of, or as consideration for a promise or agreement to pay, anything of pecuniary value, or who conspires to do so, shall be [guilty of a crime against the United States.]

18 U.S.C. § 1958(a).

In our view, the plain wording of this statute supports the position of the Government. On its face, the statute sets forth two elements of proof: (1) traveling in, or using a facility of, interstate or foreign commerce, or causing another person to do so, (2) with the intent that a murder for hire be committed. As for the nexus between these elements, we have held that § 1958 requires that the defendant's travel in, or use of a facility of, interstate or foreign commerce be useful to, or in furtherance of, his murder-for-hire scheme. *See United States v. Richeson*, 338 F.3d 653, 659 (7th Cir. 2003); *see also United States v. Weathers*, 169 F.3d 336, 343 (6th Cir. 1999); *United States v. Houlihan*, 92 F.3d 1271, 1292 (1st Cir. 1996).

In reaching this conclusion, we join the overwhelming majority of circuits that have addressed the issue in holding that the plain language of § 1958 does not require the existence of an actual murder-for-hire agreement. *See United States v. Preacher*, 631 F.3d 1201, 1203 (11th Cir. 2011) (per curiam) ("[O]nce the defendant uses an instrument of interstate commerce with the intent that a murder-for-hire be committed, the crime is completed."); *United States v. Driggers*, 559 F.3d 1021, 1024 (9th Cir. 2009) (defining "the elements of a section 1958 violation as '1) to cause another to travel in interstate commerce, 2) *with the intent* that a murder be committed' for hire" (alteration omitted) (emphasis in original) (quoting *United States v. Ritter*, 989 F.2d 318, 321 (9th Cir. 1993)); *Ng v. Att'y Gen. of the United States*, 436 F.3d 392, 397

(3d Cir. 2006) (noting that § 1958 requires "only proof of intent to enter into a murder-for-hire agreement and not of an actual agreement"); *United States v. Delpit*, 94 F.3d 1134, 1149 (8th Cir. 1996) ("[Section 1958] outlaws using interstate-commerce facilities with the intent that murder-for-hire be committed. Once the interstate-commerce facility is used with the required intent the crime is complete."); *United States v. Ransbottom*, 914 F.2d 743, 746 (6th Cir. 1990) ("On its face, the statute at issue allows a conviction if the government proves that a defendant traveled in interstate commerce with the intent that a contract murder be committed. … [T]he statute gives no indication that [a] contract must be in existence … at the time of the travel."); *see also United States v. Bredimus*, 352 F.3d 200, 207 (5th Cir. 2003) (noting, in dicta, that "[s]ection 1958 requires only that the government prove the defendant traveled in interstate or foreign commerce with the intent that a murder be committed for hire"). As these courts recognize, the statutory phrase "consideration for a promise or agreement to pay" does not create a separate "agreement element," but rather modifies the type of intent which a defendant must possess, namely, the intent to commit a murder for hire. *See, e.g.*, *United States v. Smith*, 755 F.3d 645, 647 (8th Cir. 2014) ("To be convicted of violating 18 U.S.C. § 1958(a) an individual need only travel or use a facility of interstate commerce, or cause another to do so, *intending* a murder be committed for hire. … [Section] 1958(a) does not require that the offer have been made or accepted before the statute is violated." (emphasis in original)).

Our understanding of the plain wording of § 1958 is confirmed by its statutory and legislative history. Section 1958

was modeled on, and intended to supplement, the Travel Act, 18 U.S.C. § 1952(a),[18] which reads as follows:

> **(a)** Whoever travels in interstate or foreign commerce or uses the mail or any facility in interstate or foreign commerce, with intent to—
>
>> **(1)** distribute the proceeds of any unlawful activity; or
>>
>> **(2)** commit any crime of violence to further any unlawful activity; or
>>
>> **(3)** otherwise promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any unlawful activity,
>
> and thereafter performs or attempts to perform—
>
>> **(A)** an act described in paragraph (1) or (3) shall be fined under this title, imprisoned not more than 5 years, or both; or
>>
>> **(B)** an act described in paragraph (2) shall be fined under this title, im-

---

[18] *See United States v. Marek*, 238 F.3d 310, 317 n.29 (5th Cir. 2001) (en banc) (noting "that it is appropriate to interpret § 1958 in light of § 1952 given that the two sections employ similar language, and that § 1958 was intended to supplement § 1952"); S. Rep. No. 98-225, at 306 (1984), *as reprinted in* 1984 U.S.C.C.A.N. 3182, 3485 (noting that § 1958 "follows the format" of the Travel Act).

> prisoned for not more than 20 years,
> or both, and if death results shall be
> imprisoned for any term of years or
> for life.

18 U.S.C. § 1952. A Travel Act violation consists of three basic elements: (1) traveling in, or using a facility of, interstate or foreign commerce, (2) with the intent to commit a specified unlawful act, and (3) thereafter performing or attempting to perform that act. *See United States v. Raineri*, 670 F.2d 702, 715 (7th Cir. 1982).

Notably, unlike the Travel Act, § 1958 contains no requirement that a defendant carry out or otherwise attempt to accomplish his criminal intent. That is, it contains no explicit requirement that a defendant actually enter into a murder-for-hire agreement. Because § 1958 was modeled on the Travel Act, this omission is significant. "It is generally presumed that Congress acts intentionally and purposefully when it includes particular language in one section of a statute but omits it in another." *City of Chicago v. Envtl. Def. Fund*, 511 U.S. 328, 338 (1994) (alteration omitted) (internal quotation marks omitted). Here, this omission suggests that Congress intended for § 1958 to require *only* that a defendant travel in, or use a facility of, interstate commerce with the requisite criminal intent. This understanding of the statute accords with its legislative history, which indicates that "[t]he gist of the offense is the travel in interstate commerce or the use of the facilities of interstate commerce or of the mails with the requisite intent … ." S. Rep. No. 98-225, at 306 (1984), *as reprinted in* 1984 U.S.C.C.A.N. 3182, 3485.

Despite the clear import of the statute's text and history, Mr. Dvorkin nonetheless contends that our previous cases

require a different result. He points to our decisions in *Riche-son* and *United States v. Gibson*, 530 F.3d 606 (7th Cir. 2008), which, he asserts, interpret the word "consideration" in § 1958 as requiring proof that "the solicitor and the murder-er" reached "a promise or agreement."[19] Those decisions, however, do not require proof of a separate agreement ele-ment (i.e., that an offer was made or accepted), but rather merely clarify the meaning of "consideration" within the context of § 1958's intent element. *See Gibson*, 530 F.3d at 609 ("The issues Gibson raises involve the meaning of 'consider-ation for the receipt of, or as consideration for a promise or agreement to pay, anything of pecuniary value.'"); *Richeson*, 338 F.3d at 657, 659 (addressing the defendant's "argu[ment] that the government never established his intent to pay for the murders" and concluding that the "evidence plainly re-veal[ed his] intent to compensate his coconspirators"). In neither case did we squarely face, or decide, whether § 1958 requires as an element that the defendant actually enter into a murder-for-hire agreement. Similarly, although we stated in *United States v. Mandel*, 647 F.3d 710 (7th Cir. 2011), that § 1958 requires proof that "something of pecuniary value was promised or agreed to be paid in consideration of the murder," that statement clearly was dictum and was not central to our holding, which merely addressed whether the defendant "was entrapped into using a facility of interstate commerce in furtherance of [a murder-for-hire] plot."[20] *Id.* at

---

[19] Appellant's Br. 17 (internal quotation marks omitted).

[20] Indeed, *Mandel*'s citation to the Eleventh Circuit's decision in *Preacher* makes clear that we intended no disagreement with that court's holding that § 1958 requires only the use of an interstate commerce facility with

(continued…)

717, 719. In sum, a close reading of our previous cases makes clear that we never have had the occasion to address squarely this precise issue.[21]

---

(…continued)

the necessary intent. *See* 647 F.3d at 717 (citing *United States v. Preacher*, 631 F.3d 1201, 1203 (11th Cir. 2011)); *see also id.* at 716 (noting, in dicta, that "what section 1958 prohibits is the use of a facility of interstate commerce … with the intent to commit a murder for hire").

[21] We note that the Second Circuit previously has made statements which could be construed as inconsistent with the position we take here today. *See United States v. Hardwick*, 523 F.3d 94, 99 (2d Cir. 2008) ("The federal murder-for-hire statute proscribes a very limited category of behavior; only those instances in which one party agrees to commit a murder in exchange for another party's provision (or future promise) of payment are punishable under § 1958." (quoting *United States v. Frampton*, 382 F.3d 213, 217 (2d Cir. 2004))). Nevertheless, the Second Circuit's stance on this issue is not entirely clear. Although both *Hardwick* and *Frampton* seem to indicate that § 1958 requires proof of an actual murder-for-hire agreement, neither case squarely addresses that issue. Rather, the disputed question in both cases was whether a given item or service qualified as something of "pecuniary value" under § 1958. *See Hardwick*, 523 F.3d at 101 (addressing whether the defendant "intended the gun he provided Trujillo to serve as consideration … for Trujillo's promise to murder the intended victim"); *Frampton*, 382 F.3d at 217–19 (addressing whether an "unspecified future 'favor'" could qualify as something of "pecuniary value"). Further, both cases at times appear to recognize that the statute's reference to consideration merely modifies the type of intent which a defendant must possess (i.e., the intent that a murder for hire be committed). *See Hardwick*, 523 F.3d at 99 (reviewing whether the defendant "intended the gun he provided [a hitman] to serve as consideration"); *Frampton*, 382 F.3d at 218 (noting that "the relevant inquiry [was] whether the evidence was sufficient to establish that [the defendants] *intended* that [a] murder … take place in exchange for the provision of, or a promise to pay, anything of pecuniary value" (emphasis added)). Un-

(continued…)

Given the text and history of the statute, we now hold squarely that § 1958 does not require proof of an actual murder-for-hire agreement, but rather only that the defendant act with the *intent* that a murder for hire be committed. Because the Government was not required to prove the existence of such an agreement, Mr. Dvorkin's sufficiency of the evidence claim must fail.

**2.**

Mr. Dvorkin also challenges his conviction under 18 U.S.C. § 373(a). That section reads, in relevant part, as follows:

> Whoever, with intent that another person engage in conduct constituting a felony that has as an element the use, attempted use, or threatened use of physical force against property or against the person of another in violation of the laws of the United States, and under circumstances strongly corroborative of that intent, solicits, commands, induces, or otherwise endeavors to persuade such other person to engage in such conduct, shall be [guilty of a crime against the United States.]

18 U.S.C. § 373(a). To prove a violation of § 373(a), "the government must establish (1) with strongly corroborative cir-

---

(…continued)

der these circumstances, it is unclear where the Second Circuit stands on this issue.

cumstances that a defendant intended for another person to commit a violent federal crime, and (2) that a defendant solicited or otherwise endeavored to persuade the other person to carry out the crime." *United States v. White*, 610 F.3d 956, 959 (7th Cir. 2010) (per curiam).

Here, Mr. Dvorkin was charged with, and convicted of, soliciting Bevis to violate § 1958. Therefore, the Government was required to prove (1) that Mr. Dvorkin solicited Bevis to use, or cause another to use, a facility of interstate commerce with the intent that a murder for hire be committed, and (2) that he actually intended Bevis to commit the offence, as evidenced by "strongly corroborative" circumstances.

Mr. Dvorkin challenges his conviction on both grounds.[22] First, he submits that he "never reached any economic understanding or agreement with Bevis" and "[t]hus [that] he never solicited, commanded, induced, or otherwise endeavored to persuade Bevis to actually put any violent plan in motion."[23] Second, he asserts that, although he "voiced his ill will toward" Meyer, "he never consummated [that] ill will with anything that was 'strongly corroborative' of his intent to have Bevis actually put a plan into motion."[24]

---

[22] Notably, Mr. Dvorkin does not dispute that § 1958 is an offense "that has as an element the use, attempted use, or threatened use of physical force against property or against the person of another." 18 U.S.C. § 373(a). We therefore assume without deciding that § 1958 qualifies as such an offense.

[23] Appellant's Br. 12 (emphasis omitted).

[24] *Id.* at 16 (internal quotation marks omitted).

These contentions miss the mark. Starting with the solicitation element, neither § 373(a) nor § 1958 requires that a defendant reach an economic understanding or agreement in order to solicit a violation of § 1958. *See Smith*, 755 F.3d at 647 (noting that "§ 1958(a) does not require that [an] offer have been made or accepted before the statute is violated"); *United States v. Barefoot*, 754 F.3d 226, 238 (4th Cir. 2014) (noting that "a straightforward request or directive fulfills the [solicitation] element of § 373(a)").[25] Rather, the Government merely was required to show that Mr. Dvorkin requested or "endeavor[ed] to persuade" Bevis to engage in conduct proscribed by § 1958. 18 U.S.C. § 373(a). At trial, the Government argued that Mr. Dvorkin solicited Bevis to violate § 1958 on two occasions: (1) on April 6, when he offered Bevis $50,000 to procure the murder of Meyer and gave him information on Meyer's Texas whereabouts, and (2) on April 18, when Mr. Dvorkin instructed Bevis to convince the Florida hitman to accept $50,000 in exchange for killing Meyer. These communications are each more than sufficient to sustain the jury's finding of solicitation.

As for the intent element, the evidence of record amply supports the jury's finding that Mr. Dvorkin intended for Bevis to engage in conduct proscribed by § 1958 "under circumstances strongly corroborative of that intent." *Id.* Evidence sufficient to strongly corroborate a defendant's intent includes, but is not limited to,

---

[25] *See also* 2 Wayne R. LaFave, *Substantive Criminal Law* § 11.1 (2d ed. 2003) ("[T]he crime of solicitation requires no agreement or action by the person solicited, and thus the solicitation is complete when the solicitor, acting with the requisite intent, makes the command or request.").

> evidence showing that the defendant: (1) offered or promised payment or some other benefit to the person solicited; (2) threatened to punish or harm the solicitee for failing to commit the offense; (3) repeatedly solicited the commission of the offense or expressly stated his seriousness; (4) knew or believed that the person solicited had previously committed a similar offense; or (5) acquired weapons, tools or information, or made other preparations, suited for use by the solicitee.

*United States v. White*, 698 F.3d 1005, 1015 (7th Cir. 2012) (per curiam). Such circumstantial evidence is present here. Mr. Dvorkin repeatedly solicited Bevis to arrange for the contract killing of Meyer. He put together $50,000 in untraceable funds to pay for the killing and, at one point, offered Bevis a $50,000 low-interest loan in exchange for negotiating a lower price with the Florida hitman. Lastly, he acquired information on Meyer's whereabouts (i.e., his LinkedIn profile) for use in committing the offense. Together, these circumstances strongly corroborate Mr. Dvorkin's criminal intent. Accordingly, we conclude that the evidence is sufficient to uphold his conviction under § 373(a).[26]

---

[26] Mr. Dvorkin alternatively contends that the jury's verdict is against the manifest weight of the evidence for the same reasons asserted in his sufficiency of the evidence challenges. We again disagree. As we have explained, Mr. Dvorkin's sufficiency arguments all proceed from an erroneous understanding of §§ 1958 and 373 and, therefore, do not show that the jury's verdict is so weak as to warrant a new trial.

**B.**

Mr. Dvorkin next contends that he presented sufficient evidence to establish a renunciation defense under 18 U.S.C. § 373(b) and, consequently, that the district court erred in denying his motion for acquittal with respect to his solicitation charge. We review a district court's denial of a defendant's motion for acquittal de novo. *United States v. Mohamed*, 759 F.3d 798, 803 (7th Cir. 2014). "[U]nlike a typical challenge to the sufficiency of the evidence, [a] defendant's burden is even greater" where, as here, he contends that acquittal is warranted based on an affirmative defense. *United States v. Waagner*, 319 F.3d 962, 964 (7th Cir. 2003). To prevail on such a claim, the defendant must show that the evidence, even when viewed in the light most favorable to the Government, is "so one-sided that" a rational jury could not reach "any decision [other than] a finding of not guilty" based on the defense asserted. *Id.*; *see also United States v. Sax*, 39 F.3d 1380, 1385 (7th Cir. 1994).

Section 373(b) of Title 18 provides a renunciation defense for defendants charged with violating § 373(a).[27] To establish

---

[27] Section 373(b) reads as follows:

> It is an affirmative defense to a prosecution under this section that, under circumstances manifesting a voluntary and complete renunciation of his criminal intent, the defendant prevented the commission of the crime solicited. A renunciation is not "voluntary and complete" if it is motivated in whole or in part by a decision to postpone the commission of the crime until another time or to substitute another victim or another but similar objective. If the defendant raises the affirmative defense at

(continued…)

the defense, a defendant must show (1) that he "prevented the commission of the crime solicited," and (2) that he did so "under circumstances manifesting a voluntary and complete renunciation of his criminal intent." 18 U.S.C. § 373(b). A renunciation is not "complete" if it is tentative, conditional, or otherwise "motivated in whole or in part by a decision to postpone the commission of the crime until another time." *Id.* Relatedly, a renunciation "is not voluntary if it is motivated, in whole or in part, by circumstances, not present or apparent at the inception of the actor's course of conduct, that increase the probability of detection or apprehension … ." Model Penal Code § 5.01(4); *accord United States v. Dworken*, 855 F.2d 12, 22 (1st Cir. 1988); 21 Am. Jur. 2d *Criminal Law* § 157 (2008); 4 Charles E. Torcia, *Wharton's Criminal Law* § 700 (15th ed. 1996); 22 C.J.S. *Criminal Law* § 161 (2006).

Mr. Dvorkin submits that he renounced his criminal intent on three different occasions: (1) on April 30, when he told Bevis that he had a "different avenue" that he wanted to take with regard to killing Meyer,[28] (2) on May 7, when he instructed Bevis to tell the Florida hitman that "it fell through,"[29] and (3) on May 11, when he told Bevis that the plan was "all stopped" and that he was "just gonna get on

---

(…continued)

> trial, the defendant has the burden of proving the defense by a preponderance of the evidence.

18 U.S.C. § 373(b).

[28] R.174 at 92.

[29] R.146-4 at 2.

with [his] life" and deal with Meyer through legal means.[30] In response, the Government contends that Mr. Dvorkin cannot establish this defense because Bevis already had completed the solicited § 1958 offense well before April 30 and, in any event, none of his alleged renunciations were voluntary *and* complete.[31]

We agree with the Government on both of its contentions. First, to invoke § 373(b)'s renunciation defense, a defendant must "actually prevent[] the commission of the crime [solicited] (not merely ma[k]e efforts to prevent it)." S. Rep. No. 98-225, at 309 (1984), *as reprinted in* 1984 U.S.C.C.A.N. 3182, 3489. "[O]nce a crime is complete[], it logically can no longer be" prevented. *Preacher*, 631 F.3d at 1204. Here, as far as Mr. Dvorkin knew, Bevis had completed the solicited § 1958 offense as early as April 18, when he told Mr. Dvorkin that he had traveled to Florida to arrange for a hitman to kill Meyer. Because, for solicitation purposes, a "defendant's culpability is to be measured by the circumstances as he believes them to be," *United States v. Devorkin*, 159 F.3d 465, 467 n.2 (9th Cir. 1998) (quoting 2 Wayne R. LaFave & Austin W. Scott Jr., *Substantive Criminal Law* § 6.1 (1st ed. 1986)), a reasonable jury easily could conclude that Mr. Dvorkin had failed to "prevent[] the commission of the crime solicited," 18 U.S.C. § 373(b).

---

[30] R.146-7 at 4–5.

[31] The Government also contends that Mr. Dvorkin waived, or at least forfeited, his renunciation defense by failing to assert it at trial. Because we conclude that this defense fails on its merits, we need not decide whether it was preserved. *See United States v. Gonzalez-Mendoza*, 584 F.3d 726, 730 n.7 (7th Cir. 2009).

Second, regardless of timing, the record does not establish, as a matter of law, that Mr. Dvorkin voluntarily *and* completely renounced his criminal intent. With respect to his April 30 and May 7 statements, a jury viewing those communications reasonably could conclude that Mr. Dvorkin merely had put his plan to use the Florida hitman on hold. Although he did, on May 7, instruct Bevis to tell the Florida hitman that "it fell through," after discussing the issue further, he ultimately asked Bevis to negotiate a lower price with the Florida hitman. When Bevis later did so, Mr. Dvorkin, far from abandoning his criminal plan, indicated that he would use the Florida hitman if the "other avenue" killer failed to complete the task by May 18. Given these facts, we cannot say, as a matter of law, that Mr. Dvorkin's April 30 and May 7 communications with Bevis constitute a "complete" renunciation of his criminal intent.

The only statement by Mr. Dvorkin that comes anywhere close to evincing a "complete" renunciation of his criminal intent was his May 11 phone conversation with Bevis. That renunciation, however, occurred four days after the FBI had confronted Mr. Dvorkin about his plan to kill Meyer. Under these circumstances, a reasonable jury certainly could conclude that Mr. Dvorkin's May 11 renunciation was not voluntary.

In sum, we cannot say that the evidence in favor of Mr. Dvorkin's renunciation defense was so one-sided as to require his acquittal as a matter of law. The district court properly upheld his conviction for solicitation.

## C.

We next consider Mr. Dvorkin's contention that the district court improperly restricted his cross-examination of Bevis in violation of Federal Rule of Evidence 608(b). "We review the district court's decision to limit the scope of cross-examination for an abuse of discretion." *United States v. Holt*, 486 F.3d 997, 1000–01 (7th Cir. 2007). "If an error is found, the verdict will not be reversed if the error was harmless." *United States v. Del Valle*, 674 F.3d 696, 702 (7th Cir. 2012).

### 1.

Before trial, Mr. Dvorkin filed a motion in limine seeking to admit documentary evidence which, he claimed, "show[ed] a history of dishonest conduct by Bevis."[32] In particular, Mr. Dvorkin sought to admit (1) a 2011 order from the Illinois Secretary of State finding that Bevis unlawfully had sold unregistered securities and, as a result, permanently barring him from offering or selling securities in the state (the "2011 order"), and (2) a 2012 civil complaint filed against Bevis in Illinois state court based on that same unlawful conduct (the "2012 complaint").

The district court held a hearing on Mr. Dvorkin's motion. At the hearing, the court determined that Mr. Dvorkin could neither introduce nor cross-examine Bevis about the 2011 order or the 2012 complaint. The court, however, did clarify that Mr. Dvorkin could "inquire into [the] specific in-

---

[32] R.56 at 6.

stances of misconduct underlying the" 2011 order and 2012 complaint provided that he did so "without mentioning" either piece of evidence.[33] The court explained its reasoning for this distinction as follows:

> [U]nder [Rule] 608, if you are going to try to get in specific instances of conduct that go to truthfulness or untruthfulness, you cannot introduce extrinsic evidence.
>
> And by asking questions about a lawsuit or a Secretary of State finding, that is a way of introducing extrinsic evidence through the witness himself.
>
> So it basically tucks into the—tucks into the question of extrinsic evidence, and that is barred under 608.[34]

At trial, defense counsel cross-examined Bevis about the specific instances of misconduct underlying both the 2011 order and the 2012 complaint. In response, Bevis acknowledged that, in 2006, he had sold unregistered securities of a company that he had jointly founded. Defense counsel then inquired whether Bevis had "been barred from issuing any stock by the State of Illinois."[35] The Government objected to this question, and the court sustained the objection. Later, at

---

[33] R.67 at 7.

[34] R.106 at 26.

[35] R.175 at 108.

a sidebar, the court asked defense counsel what basis he had for asking the question, triggering the following exchange:

> MR. FRANKEL:  I think it goes directly back to the representations he made about the issuance of the stock, and it shows that, you know, it corroborates that there was no stock ever registered or issued.
>
> THE COURT:  So that's extrinsic evidence of a third-party, a government agency's view of—a view of the—some finding that Mr. Bevis must not register any other securities; but I said that that was barred.
>
> MR. FRANKEL:  That specific issue was barred. I don't think that you said that that was barred.
>
> THE COURT:  Yes, third-party, essentially, opinion evidence that the—that the witness made a false statement is extrinsic, and I barred it in the form of the Illinois Secretary of State findings, as well as even the complaint, you know, that others made. …
>
>     … .

THE COURT:     … [G]oing forward, … you must not refer to a third-party, either the complaint on or about the finding. The exception being, you may generically refer to the filing of a civil case against Mr. Bevis in 2009, where he made the accusation that his opponent had asked him to plant drug evidence. So that, for foundation purposes, that can come in, but not—no references to, you know, Secretary of State findings or any other third-party complaints.

… .

MR. WALLIN:     One other thing as a point of clarification. Can we ask whether or not he was aware that the law in Illinois required him to register securities?

THE COURT:     No. This 608 impeachment has to be cabined fairly because of its potential for mischief and to distract the jury, as is happening right now, and so that doesn't get the specific, you know, falsities or not of a representation

> that you made to someone
> else.
>
> MR. WALLIN:   Okay.[36]

Upon resuming his cross-examination, defense counsel did not again reference the 2011 order or 2012 complaint.

## 2.

Rule 608(b) provides that "extrinsic evidence is not admissible to prove specific instances of a witness's conduct in order to attack or support the witness's character for truthfulness," but that a "court may, on cross-examination, allow them to be inquired into if they are probative of the [witness's] character for truthfulness or untruthfulness." Fed. R. Evid. 608(b). As we previously have recognized, Rule 608(b) "only prohibits the use of extrinsic evidence, not lines of questioning." *Holt*, 486 F.3d at 1002; *accord United States v. Dawson*, 434 F.3d 956, 958–59 (7th Cir. 2006). Consequently, the rule "does not mandate the prohibition of questions regarding the punishment imposed on a witness for a given course of conduct," *Holt*, 486 F.3d at 1002, nor does it preclude cross-examination "about a third party's opinion of [a witness's] credibility," *Dawson*, 434 F.3d at 959. "[S]uch questions," we have explained, "are outside the scope of Rule 608(b)." *Id.*

This, of course, does not mean "that every question a lawyer might want to ask [on these matters] would be proper cross-examination." *Id.* "Rule 608(b) leaves the trial judge

---

[36] *Id.* at 112–14. We have reformatted the trial transcript for readability.

with broad discretion to limit such questioning, stating only that prior instances of conduct 'may' be inquired of …, if probative of truthfulness or untruthfulness." *Holt*, 486 F.3d at 1002 (internal quotation marks omitted). Put differently, such questioning often will be subject to exclusion on other grounds, such as hearsay or Rule 403. *See id.*; *see also Thompson v. City of Chicago*, 722 F.3d 963, 977 (7th Cir. 2013).

Here, Mr. Dvorkin contends that the district court abused its discretion by limiting his cross-examination of Bevis based on an incorrect interpretation of Rule 608(b). In light of this circuit's precedent, we must agree. Under *Dawson* and *Holt*, the district court's only stated reason for barring Mr. Dvorkin from questioning Bevis about the 2011 order and the 2012 complaint was erroneous.[37] Rule 608(b) does not prohibit "lines of questioning," including those "regarding the punishment imposed on a witness for a given course of conduct." *Holt*, 486 F.3d at 1002.[38]

---

[37] The Government contends that the district court offered other reasons, aside from Rule 608(b), for limiting Mr. Dvorkin's cross-examination of Bevis and, consequently, that the district court did not abuse its discretion. Although we agree that the district court would not have abused its discretion had it offered a legitimate, independent reason for its ruling, *see United States v. Holt*, 486 F.3d 997, 1002 (7th Cir. 2007), the record here clearly shows that it never did so.

[38] As the Government correctly notes, our interpretation of Rule 608(b) in *United States v. Dawson*, 434 F.3d 956 (7th Cir. 2006), conflicts with the position of both the Advisory Committee and the Third Circuit, *see* Fed. R. Evid. 608 advisory committee's note to 2003 amendment; *United States v. Davis*, 183 F.3d 231, 257 n.12 (3d Cir.), *amended by* 197 F.3d 662 (3d Cir. 1999), and has been criticized and not followed by some commentators, *see* 4 Michael H. Graham, *Handbook of Federal Evidence* § 608:4 (7th ed.

(continued…)

That the court erred in excluding this evidence, however, does not end our analysis. "[E]videntiary errors are subject to harmless error review." *United States v. Vargas*, 689 F.3d 867, 875 (7th Cir. 2012); *see also United States v. Useni*, 516 F.3d 634, 651–52 (7th Cir. 2008) (noting that we will only reverse a conviction based on a nonharmless evidentiary error). "To determine whether an evidentiary error is harmless, we consider whether, to the average juror, the prosecution's case would have been significantly less persuasive absent the error." *United States v. DeMarco*, 784 F.3d 388, 394 (7th Cir. 2015); *see also United States v. Gomez*, 763 F.3d 845, 863 (7th Cir. 2014) (en banc).

Here, the evidence of Mr. Dvorkin's guilt was substantial and would not have been any less so had he been allowed to cross-examine Bevis about the 2011 order or the 2012 complaint. Almost every conversation between Bevis and Mr. Dvorkin was proven by audio recordings; those that were not recorded were substantiated by other physical evidence. Moreover, on cross-examination, Bevis admitted to

---

(…continued)

2012) (criticizing our holding in *Dawson*); 1 Kenneth S. Broun et al., *McCormick on Evidence* § 41 (7th ed. 2013) (endorsing the interpretation of the Advisory Committee). However, the other circuits to have ruled on the matter agree with our view. *See United States v. Woodard*, 699 F.3d 1188, 1195 (10th Cir. 2012); *United States v. Cedeño*, 644 F.3d 79, 82–83 (2d Cir. 2011); *United States v. Whitehead*, 618 F.2d 523, 529 (4th Cir. 1980); *see also* Peter Walkingshaw, Note, *Prior Judicial Findings of Police Perjury: When Hearsay Presented as Character Evidence Might Not Be Such a Bad Thing*, 47 Colum. J.L. & Soc. Probs. 1, 20 (2013) (noting that "the consistent trend among the Circuits has been to … allow cross-examination into the consequences of prior conduct by a witness that tends to show dishonesty (at least in the absence of a hearsay objection)").

the specific instances of misconduct underlying the 2011 order and the 2012 complaint (i.e., selling unregistered securities). Given these circumstances, the fact that Bevis was sanctioned and later sued for his misconduct is of de minimis probative value and certainly would not have rendered the Government's case "significantly less persuasive." *See DeMarco*, 784 F.3d at 394; *see also United States v. Cavender*, 228 F.3d 792, 799 (7th Cir. 2000) ("An error in the refusal to admit evidence is harmless if the evidence of guilt was overwhelming and the defendant was allowed to put on a defense, even if that defense was not as complete as the defendant might have preferred."). We therefore conclude that the district court's error was harmless and thus does not warrant reversal.

## D.

Finally, Mr. Dvorkin submits that the Government made an improper argument during its rebuttal at closing, thereby depriving him of a fair trial. "In reviewing a claim of prosecutorial misconduct, we consider first whether the challenged remark by the prosecutor was improper, and second, whether it prejudiced the defendant." *United States v. Wescott*, 576 F.3d 347, 355 (7th Cir. 2009). A prosecutorial comment during closing arguments is improper if it is "aimed at inflaming the passions of the jury." *United States v. Caliendo*, 910 F.2d 429, 436 (7th Cir. 1990).

Here, Mr. Dvorkin contends that the following remarks made by the Government during its rebuttal argument were improper:

| [GOVERNMENT]: | The victim here is Larry Meyer. And it is—it is offensive to think that Mr. Dvorkin gets out of the responsibility of his actions, of his words, of his choices— |
|---|---|
| MR. FRANKEL: | Objection, Judge. Getting out of responsibility, that's an improper argument. It's about the facts and the evidence, Judge. |
| THE COURT: | Overruled. |
| [GOVERNMENT]: | That he gets out of the responsibility of his own actions and words and choices here because Mr. Bevis didn't just walk away in that parking lot meeting. It's offensive. |
| MR. FRANKEL: | Objection, Judge. |
| THE COURT: | Overruled.[39] |

According to Mr. Dvorkin, the prosecutor's suggestion that he was attempting to get out of responsibility for his actions was "designed to appeal to the passions, fears, and vulnerabilities of the jury."[40] For its part, the Government submits

---

[39] R.178 at 81. We have reformatted the trial transcript for readability.

[40] Appellant's Br. 38.

that these statements properly were made in response to the following argument by the defense at closing:

> April 6th. This is the very first meeting, supposedly, between Bevis, where Bevis supposedly claims Dvorkin asked him about finding a hit man. Bevis says that Dan told him he wanted Larry Meyer to stop breathing. And here's what we know. Bevis does not tell Dan it's a bad idea. He does not tell Dan to drop it. He does not tell Dan he is asking him to do something illegal and is going to go to the police. He doesn't behave—we're talking normal here. Mr. Perconte used the word normal. He does not behave normally.

> Instead, he says he knows a hit man … .And as of April 6th, there's no solicitation; there's no agreement; there's no money; and nobody is hired. On April 6th there was no solicitation. There's no agreement, no money, and nobody hired.[41]

We do not perceive any impropriety in the Government's remarks. The prosecutor merely stated that Mr. Dvorkin cannot avoid liability for his actions simply because Bevis did not "walk away" from Mr. Dvorkin's proposal. This statement is neither inaccurate, nor likely to invite the jury to decide the case on an improper basis. Further, even if these statements were improper (and they are not), they were not

---

[41] R.178 at 63–64.

so prejudicial as to deprive Mr. Dvorkin of a fair trial. These comments were brief, isolated, and made in direct response to defense counsel's insinuation that Bevis's failure to dissent from Mr. Dvorkin's proposal was somehow probative of Mr. Dvorkin's innocence. *See Bartlett v. Battaglia*, 453 F.3d 796, 803 (7th Cir. 2006) ("Where defense counsel has 'invited' a response, a prosecutor's otherwise improper remarks will not warrant reversal of a conviction if they do nothing more than 'right the scale.'" (quoting *United States v. Young*, 470 U.S. 1, 12–13 (1985)). In sum, because the contested remarks were neither improper nor prejudicial, they did not deprive Mr. Dvorkin of a fair trial.

### Conclusion

The judgment of the district court is affirmed.

AFFIRMED