In the

# United States Court of Appeals
## For the Seventh Circuit

No. 02-3896

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

WALTER RICHESON, JR.,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Northern District of Indiana, Hammond Division.
No. 2:01-CR-54—**James T. Moody**, *Judge.*

ARGUED MAY 30, 2003—DECIDED JULY 22, 2003

Before FLAUM, *Chief Judge*, and EASTERBROOK and
RIPPLE, *Circuit Judges*.

FLAUM, *Chief Judge*. A jury convicted Walter Richeson,
Jr., of four counts of conspiring to use interstate com-
merce in the commission of a murder for hire, in violation
of 18 U.S.C. § 1958(a). Richeson appeals his conviction on
three grounds, arguing first that the evidence was insuf-
ficient to prove he provided any consideration for the
alleged murder-for-hire, second that the evidence failed
to establish he used a facility in interstate commerce
when he made only intrastate phone calls to plan the
murders, and third that the district court abused its
discretion by admitting unfairly prejudicial evidence of

his plans to murder the state prosecutor, intimidate a juror, and bribe the trial judge. We affirm.

## I. BACKGROUND

In the fall of 1999, Richeson was arrested and charged in Indiana state court with the murder of Brant Martin. Eyewitness Bradley Koonce told state investigators that Richeson killed Martin, and Steve Mucha informed investigators that Richeson confessed to him that he had killed Martin. Mucha was released after giving his statement, but Koonce was taken into custody on unrelated charges and placed in Lake County Jail. Richeson knew that the state's case against him was strong, and decided that the best way to defeat the charges was to have witnesses Koonce and Mucha killed. Since Koonce was in custody, however, Richeson thought killing him was not feasible; instead, Richeson devised a plan to kidnap Koonce's parents (his mother and step-father) and use threats of death to them as a way to force Koonce to recant. Even after Koonce recanted, however, Richeson still intended to kill Koonce's parents.

Richeson next conspired with his wife Jennifer and fellow inmates Daniel Wolfe and Curtis Jones to commit the murders. Richeson wrote letters to Jennifer outlining his plans and asking her to contact a man named "Dice" to carry out the actual kidnaping and killings. In one letter, which Richeson sent to Jennifer with instructions that it be forwarded to Dice, Richeson begged Dice to kill Koonce and Mucha and told Dice he would make it up to him anyway he wanted if Dice did what Richeson asked him to do. Additionally, Richeson called Jennifer numerous times from jail asking her to coordinate his kidnaping and murder plans.

Richeson also sought help from Wolfe and Jones to carry out his plan. The three inmates agreed that the first

one to "bond out" would help the others get out; Jones also agreed that if he bonded out he would help find weapons to use in the plan to murder Mucha and Koonce's parents. At that time Richeson offered to pay Jones between $700-$1000 if he could get a gun for the murder, but Jones testified that he told Richeson he wasn't worried about the money. Wolfe bonded out first in August 2000, without help from Jones or Richeson, and once out of jail he avoided contact with Richeson. Jones made bond in November 2000, again without help from Wolfe or Richeson; shortly before Jones left the jail, Richeson asked him if he was still in on the plan. Jones pointed out that Richeson had not helped him make bond, as he had promised to do, but added that he would nevertheless see what he could do to help. Richeson then sent Jones two letters in December of 2000, imploring him to help him kill Mucha and kidnap Koonce's parents; the second of the two letters was written in a crude code which was supposed to be read using the "decoder" contained in the first letter.

Unknown to either Jones or Richeson, Wolfe had informed an agent from the Bureau of Alcohol, Tobacco, and Firearms ("ATF") of Richeson's plan to murder Mucha and Koonce's parents while Wolfe was still incarcerated. Although Wolfe had avoided contact with Richeson after his release from jail in August of 2000, he received a call from an unidentified person in December of 2000 telling him that he had better start taking Richeson's calls. Later in December, Wolfe accepted a collect call from Richeson, who wanted to tell Wolfe how to carry out the kidnaping of Koonce's parents. Immediately after this call, Wolfe contacted ATF and told them that Richeson's plot to kill and kidnap witnesses was still active and seemingly genuine; ATF then began taping Richeson's calls from jail to Wolfe, Jennifer, and Jones.

Wolfe next introduced undercover ATF agent Joe Molina to Jennifer and Jones, telling them that Molina was his partner who would help carry out Richeson's plans. Several phone conversations between Wolfe, Molina, Jennifer, Jones, and Richeson were recorded during the month of January 2001, and these conversations revealed that Richeson was planning to enlist the help of Jones and others to kill and intimidate witnesses who would testify against him at his upcoming trial in February. In addition to Mucha and Koonce's parents, Richeson plotted to murder other witnesses (the O'Neal twins and Bob Holota) and the state prosecutor; he also planned to bribe the state trial judge and intimidate a juror by threatening his or her family.

Neither Richeson nor the government disputes that Richeson conspired and planned to commit the murders, but Richeson insists that the government never proved he conspired and planned to commit a *murder-for-hire*. Richeson claims that none of his phone conversations with Jones, Molina, Wolfe, or Jennifer in which he discussed obtaining a murder weapon constituted "consideration for a promise or agreement to pay, anything of pecuniary value" as required by the murder-for-hire statute. 18 U.S.C. § 1958(a). In contrast, the government maintains that the conversations between Richeson and his coconspirators unquestionably reveal Richeson's intent to reimburse them for their purchase of a murder weapon and to involve them in future crimes that would yield money ($100,000-$200,000 by Richeson's own account) for them to share. Moreover, the government contends that Richeson promised Molina $500 to buy a gun for himself in exchange for his help with the murders.

At trial the government introduced evidence, over Richeson's Fed. R. Evid. 403 objection, that Richeson had planned to kill the state prosecutor and steal his case file, bribe the judge, and identify and intimidate a vul-

nerable juror in order to avoid a conviction for murdering Brant Martin. Richeson argues this evidence should have been kept out because it was unfairly prejudicial, in that its sole purpose was to inflame the jury, and was of little probative value, given the admission of so much other evidence of Richeson's plan to murder Mucha and Koonce's parents. The district court allowed the contested evidence to be introduced because it was highly relevant to the government's case against Richeson, and denied Richeson's motion for a mistrial based on the admission of the evidence.

The government presented its case against Richeson over four trial days; at the close of evidence on the fourth day, Richeson moved for judgment of acquittal, claiming the government had not met its burden of proof regarding the consideration element of the murder-for-hire statute, nor had it proven the interstate commerce element with respect to the intrastate phone calls charged in Counts II and IV. The court denied his motion, and Richeson rested without presenting any evidence. Richeson was found guilty and sentenced to a term of 364 months federal imprisonment (91 months for each of the 4 counts running consecutively), which was tacked onto his Indiana state court sentence for the murder of Brant Martin.

## II.  Discussion

### A.  Consideration Element

The federal murder-for-hire statute requires the government to prove that the accused intended for a murder to be committed "as consideration for the receipt of, or as consideration for a promise or agreement to pay, anything of pecuniary value." 18 U.S.C. § 1958(a). The phrase "anything of pecuniary value" is defined in the statute as "anything of value in the form of money, a negotiable instrument, a commercial interest, or anything else the

primary significance of which is economic advantage." § 1958(b)(1). Not only money, but drugs, insurance policies, and real estate can constitute consideration for the purpose of satisfying this element. *See, e.g., United States v. Scott*, 145 F.3d 878, 884 (7th Cir. 1998) (cash payments of $5,000 and $75,000); *United States v. Washington*, 318 F.3d 845, 854 (8th Cir. 2003) (payment of 5 ounces of heroin); *United States v. Hernandez*, 141 F.3d 1042, 1057 (11th Cir. 1998) (promise to profit from insurance proceeds). Here, the government charged Richeson with promising to pay something of pecuniary value, namely money and guns, in return for the murders of Mucha and Koonce's parents.

Richeson attacks the sufficiency of the evidence against him on two fronts, claiming first that the evidence failed to show that he paid or promised to pay anyone anything of value to commit the murders; and second, even assuming he made such a promise, the evidence failed to establish that the charged mailings were made in connection with a murder-for-hire since they preceded any discussion of compensation for the murders. We review a challenge to the sufficiency of the evidence in the light most favorable to the prosecution, *Jackson v. Virginia*, 443 U.S. 307, 319 (1979), and will reverse a jury's verdict of conviction only if "there is no evidence from which a jury could convict." *United States v. Hill*, 187 F.3d 698, 700 (7th Cir. 1999). Under such a deferential standard of review, and in light of the uncontroverted facts corroborating Richeson's scheme to murder and intimidate adverse witnesses, we conclude the jury heard ample evidence of Richeson's intent to pay for the murders to sustain his conviction.

Richeson first argues that the government never established his intent to pay for the murders. Though he concedes the evidence presented at trial proved that he intended to murder certain witnesses, Richeson insists that he and his coconspirators never reached an agree-

ment regarding remuneration for their assistance in committing the crimes. According to Richeson, the evidence shows only that he intended and conspired to commit murder, not murder-for-hire. While this court has not yet defined what consideration means in the context of the murder-for-hire statute, we have said in other criminal law cases that consideration retains its contract law meaning of a bargained-for exchange of something of value. *See, e.g.*, *Gonzalez v. Kokot*, 314 F.3d 311, 317 (7th Cir. 2002) (finding agreement to dismiss criminal charges in exchange for release of civil claims to be a valid contract supported by consideration). With respect to § 1958, the language of the statute "undeniably contemplates a quid-pro-quo (or at least the promise of such)" between the solicitor and the murderer. *Hernandez*, 141 F.3d at 1057. Though the use of the word "consideration" in the statute "does not import all of contract law," it should be interpreted in accordance with its plain meaning, which is "in return for" or "in exchange for." *Id. See also Washington*, 318 F.3d at 854 ("consideration requirement of the statute has been interpreted in the traditional sense of a bargained-for exchange") (citing *United States v. Wicklund*, 114 F.3d 151, 154 (10th Cir. 1997).

In this case the government presented evidence at trial showing that Richeson offered to pay both Jones and Molina to commit the murders of Mucha and Koonce's parents. The payment offered took the form of money to buy the murder weapons, with the promise to allow the murderer to keep the weapon when he finished the job. Richeson insists he never directly promised his coconspirators compensation, and even assuming he had, he never reached an enforceable agreement as to the terms of payment. In support of his position Richeson relies on *United States v. Ritter*, 989 F.2d 318, 321 (9th Cir. 1993), in which the Ninth Circuit held there was no consideration under § 1958 where the only mention of payment to commit a murder was vaguely and tentatively prom-

ised by the defendant after being rejected as unnecessary by the undercover agent posing as a "hit man." This case is quite different from *Ritter*; here, the taped conversations between Richeson and Wolfe and Molina show that Richeson, though vague and cautious in his speech, nevertheless was fully aware of his need to compensate his coconspirators to carry out the murders. The following excerpts of three phone calls between the men illustrate this point:

*Call number one*

Richeson:   So, what man, what's he [Molina] wanting?

Wolfe:   Well . . . I told him the gameboys [guns] and that's what I told him I had to talk to you about. What you willing to offer this man? You know. We need, we need

Richeson:   We need the tools for this job, don't we?

Wolfe:   Huh?

Richeson:   We need the tools for this job

Wolfe:   Yeah . . . I'm a go this route, don't worry, I'm gonna, but he, he can keep 'em, right?

Richeson:   Huh?

Wolfe:   He can keep 'em, right?

Richeson:   For sure.

Wolfe:   Alright, well at least that's one of the top . . .

Richeson:   However you wanna play it.


*Call number two*

Molina:   What a, hey, you know, B, [Richeson], when all this is done, am I going to be taken care of?

Richeson:   Definitely.

Molina:    Definitely? All right. Cause Dan [Wolfe], Dan says you're straight up, and you know, we're working hard on this. But the game, the gameboy tips, they're the hardest thing.

Richeson:   Right. See, Danny knows what I got to do to obtain the, the money first, though. You know what I'm saying?

Molina:    The money for me? . . .

Richeson:   Well, actually, it's for all of us.


*Call number three*

Molina:    You know what I mean? Hey, if we, if we get this done, you know we talked about, are you compensating me?

Richeson:   Uh-huh.

Molina:    I got my eye on a pretty good-looking gameboy at one of these gun stores about 500 bucks. What compensation are you talking about, about how much?

Richeson:   Say that again.

Molina:    I said we talked earlier about you making payment to me.

Richeson:   Uh-huh . . .

Molina:    I said I got me, I got my eye on this new little gameboy at one of the gun stores down here. It's about 500 bucks. Are we talking 500 or so?

Richeson:   Shit probably, more than that if you want.

In addition to these and other conversations concerning payment in the form of guns, Richeson admits that he also talked to Wolfe and Molina about partnering in future crime sprees, once the murders were committed and Richeson was released from jail, that would provide the men with cash profits. Combined with the uncontroverted evidence establishing Richeson's intent to murder Mucha and Koonce's parents, this evidence plainly reveals Richeson's intent to compensate his coconspirators, with money and guns, in exchange for their committing the murders while he waited in jail. Despite the guarded language used by Richeson and the others in their phone conversations, we can easily discern a promise by the coconspirators to carry out the scheme to murder in exchange for Richeson's promise to get them money for guns, which they would keep, and to involve them in future crimes, which would yield cash profits. This constitutes a bargained-for-exchange for something of value and therefore amounts to consideration under the murder-for-hire statute.

But Richeson also argues that even if his statements over the phone amounted to consideration for a murder-for-hire, the mailings charged in the indictment (Counts I & III) do not. Richeson maintains that evidence from the mailings cannot support his murder-for-hire conviction because the letters contained no mention of remuneration and preceded the phone conversations in which payment for the murders was discussed. However, § 1958 does not require that the mailings themselves prove all the essential elements of the crime, only that they be used "with intent that a murder-for-hire be committed." 18 U.S.C. § 1958(a). The use of a facility in interstate commerce, such as the mails, is an essential element of a murder-for-hire because it justifies federal regulation of the crime. *See United States v. McPartlin*, 595 F.2d 1321, 1361 (7th Cir. 1979) (analyzing Travel Act, under which murder-for-hire used to be punished, and finding that use of inter-

state facilities merely provides the basis for federal jurisdiction). Moreover, § 1958 requires only that the interstate facility employed in a particular case be useful, not integral, to the commission or planning of the contract killing. *See United States v. Houlihan*, 92 F.3d 1271, 1292 (1st Cir. 1996) (finding interstate commerce element of § 1958 satisfied where use of interstate facilities simply furthers or aids the commission of the crime)*; United States v. McCullah*, 76 F.3d 1087, 1104 (10th Cir. 1996) (upholding murder-for-hire conviction where defendant did not know of murder plan at time of interstate travel, but his codefendants had planned a murder-for-hire and intended that defendant's interstate travel facilitate their murder scheme); *United States v. Ransbottom*, 914 F.2d 743, 746 (6th Cir. 1990) (stating that § 1958 does not require contract to exist and consideration be provided at time of interstate travel, so long as travel commenced for purpose of facilitating the murder-for-hire).

The evidence in this case shows that Richeson wrote and mailed several letters discussing his plans to murder Mucha and Koonce's parents. These mailings included a letter to a man named "Dice" in which Richeson offered to make it up to him any way he wanted if Dice would help him with the murders, and a letter to Jones in which Richeson told Jones how he wanted the kidnaping and murder of Koonce's parents to occur. Contrary to Richeson's assertion, the fact that neither of these letters makes overt mention of compensation is of no consequence; section 1958 does not require that the mailings themselves prove all the essential elements of the crime, only that the mailings be used with the intent that the murders be committed. In this case there is ample evidence, including the phone calls discussed above and Richeson's jailhouse offer to give Jones cash to buy and keep a suitable murder weapon, showing that Richeson intended to commit a murder-for-hire. We are confident that the jury could infer from this evidence that Richeson's

letters were mailed with the intent to execute his murder-for-hire scheme.

## B. Interstate Commerce Element

Richeson next challenges that part of his conviction (Counts II & IV) which is based on his use of the telephone to commit a murder-for-hire. The murder-for-hire statute requires the government to prove that the accused "use[d] or cause[d] another (including the intended victim) to use the mail or any facility in interstate or foreign commerce" with intent that a murder be committed. 18 U.S.C. § 1958(a). Richeson argues that because all of his phone calls were made intrastate, he cannot be found guilty of using a facility in interstate commerce under § 1958. In particular, though he concedes that the phone lines themselves are facilities "of" interstate commerce, Richeson insists that he did not use the phones "in" interstate commerce because he never placed a call across state lines. Richeson's construction would require us to read "in interstate or foreign commerce" as modifying "to use" rather than "facility"; or, in other words, to require that both the facility and its use be in interstate commerce. We have not squarely faced this issue in prior cases, but our sister circuits have. The Fifth Circuit, sitting en banc, soundly rejected Richeson's suggested interpretation of § 1958's interstate commerce language in *United States v. Marek*, 238 F.3d 310 (5th Cir. 2001). Richeson, however, urges us to find persuasive the Sixth Circuit's decision in *United States v. Weathers*, 169 F.3d 336 (6th Cir. 1999), where that court opined that the distinction between "in" interstate commerce and "of" interstate commerce is significant in the murder-for-hire statute.[1]

---

[1] In fact, the Sixth Circuit has very recently issued an opinion favorably citing *Marek* and limiting this part of *Weathers* to

(continued...)

We believe there is only one way to read the plain language of the murder-for-hire statute, and that is to require that the facility, and not its use, be in interstate or foreign commerce. We wholly agree with the Fifth Circuit that § 1958's construction, plain language, context in the realm of commerce clause jurisprudence, and legislative history all lead to the conclusion that "it is sufficient [under § 1958] that the defendant used an interstate commerce facility in an *intra* state fashion." *Marek,* 238 F.3d at 315. This reading of the statute makes sense from both a logical and legal standpoint; as noted in *Marek*, even the title of the statute, "Use of interstate commerce facilities in the commission of murder-for-hire," shows that Congress intended "interstate commerce" to modify "facility" and not "use." *Id.* 238 F.3d at 321. Moreover, even if the language of § 1958 was ambiguous (we believe it is not), the statute's history indicates that Congress sought to punish contract killings pursuant to its authority to regulate the instrumentalities of interstate commerce, identified in *United States v. Lopez*, 514 U.S. 549, 558 (1995), as one of three broad categories of conduct appropriately regulated by Congress using its commerce power. And when Congress elects to regulate under the second prong of *Lopez*, "federal jurisdiction is supplied by the nature of the instrumentality or facility used, not by separate proof of interstate movement." *Marek*, 238 F.3d at 317.

Applying this rule to this case, we easily conclude that the record contains sufficient evidence of Richeson's use

---

[1] (...continued)
its facts. *United States v. Cope*, 312 F.3d 757, 771 (6th Cir. 2002) ("As a matter of statutory construction [of § 1958], we agree with the Fifth Circuit's analysis."). In *Cope,* the court cites to *Marek* for the proposition that the language "in interstate of foreign commerce" modifies "facility" and not "mail" or "to use." *Cope*, 312 F.3d at 771.

of a facility in interstate commerce to satisfy the juris-dictional commerce element of § 1958. In his brief, Richeson concedes that he used a facility of interstate commerce, namely the telephone line of a carrier operating in several states, to carry out his plan to murder Mucha and Koonce's parents; this fact alone establishes federal juris-diction under the murder-for-hire statute.

## C. Rule 403 Evidence

Finally, Richeson claims that the district court erred by admitting evidence of his plot to kill the state prose-cutor, intimidate a vulnerable witness, and bribe the judge prior to his state court trial. Richeson argues that this evidence had little probative value and was unfairly prejudicial, and therefore should have been excluded under Fed. R. Evid. 403.[2] We review the district court's refusal to exclude evidence under Rule 403 for abuse of discretion, and will reverse the court's ruling only if no reasonable person could agree with it. *United States v. Thomas*, 321 F.3d 627, 630 (7th Cir. 2003). Recognizing that the balancing of probative value and prejudicial effect is a highly discretionary exercise, we give the district court's evidentiary decisions great deference. *Id.* With this in mind, we conclude that the district court did not abuse its discretion by permitting the government to introduce evidence of Richeson's plan to murder the state prosecutor, intimidate a juror, and bribe the judge in his federal murder-for-hire trial.

The government maintains, and the district court pre-sumably agreed, that the challenged evidence was highly

---

[2] Rule 403 provides: "Although relevant, evidence may be ex-cluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

relevant to Richeson's overarching scheme to avoid prosecution for his murder of Brant Martin. Specifically, the evidence revealed Richeson's back-up plan in case he could not murder Mucha and force Koonce to recant prior to his trial. The government explains that Richeson's "Plan B" was to murder the state prosecutor and steal his case file; and if that course of action proved fruitless, he would find and intimidate a vulnerable juror by threatening his or her family, or perhaps bribe the judge. Each of these plots, says the government, is highly probative of Richeson's intent to commit the murders-for-hire charged in the federal indictment. Moreover, even assuming the admission of this evidence was in error, the government suggests that it was harmless in light of all the other evidence presented to the jury establishing Richeson's "ruthlessness" in planning the murders-for-hire.

Though we agree with the government that the challenged evidence is relevant to show Richeson's intent to commit the murders-for-hire for which he was on trial, we also believe that the evidence could be viewed as prejudicial and likely to inflame the jury—especially the testimony regarding Richeson's plan to intimidate one of their own by threatening his or her family. Moreover, there is an abundance of evidence in the record establishing Richeson's intent to commit the murders of Mucha and Koonce's parents, and the addition of evidence relating to his plans to murder the prosecutor, intimidate a juror, and bribe the judge could be seen as unnecessary. But our view of the probative value and prejudicial effect of the evidence is not relevant where, as here, the district court's decision is not entirely unreasonable; the court's admission of evidence over Richeson's Rule 403 objection simply did not amount to an abuse of discretion.

### III.  CONCLUSION

The evidence presented at trial was sufficient to prove all of the essential elements of the federal murder-for-hire statute, 18 U.S.C. § 1958, including the interstate commerce and consideration elements challenged on appeal, and the district court did not abuse its discretion by admitting evidence of Richeson's plan to murder the state prosecutor, intimidate witnesses, and bribe the trial judge. His conviction is therefore affirmed.

A true Copy:

Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*