In the

# United States Court of Appeals

## For the Seventh Circuit

_____

Nos. 23-2641 and 23-2642

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

KENDRICK A. FRAZIER and KENWYN FRAZIER,

*Defendants-Appellants.*

_____

Appeals from the United States District Court for
the Southern District of Illinois.
Nos. 3:21-cr-30001-DWD-1&2 — **David W. Dugan**, *Judge.*

_____

ARGUED NOVEMBER 5, 2024 — DECIDED FEBRUARY 13, 2025

_____

Before SCUDDER, ST. EVE, and JACKSON-AKIWUMI, *Circuit Judges.*

SCUDDER, *Circuit Judge.* Kein Eastman was abducted from his grandmother's house at gunpoint, taken to an East St. Louis apartment, threatened, beaten, and shot at—all over a piece of jewelry. Eastman fled the scene moaning and with his face bloodied. No one has seen or heard from him since.

A federal indictment followed, charging two brothers, Kenwyn Frazier and Kendrick Frazier, with kidnapping. Both

chose to go to trial, and the jury returned guilty verdicts. The Fraziers now appeal. They raise a host of issues, ranging from a claim that the district court violated Kendrick's Sixth Amendment right to his choice of counsel, to challenges to the constitutionality of the federal kidnapping statute, the sufficiency of the evidence, and an aspect of their sentencing. While a couple of these issues require a more extensive analysis, in the end we affirm across the board.

### I. Factual Background

On August 13, 2020, Kenwyn Frazier laid down for a nap at an apartment in East St. Louis, Illinois. He removed his diamond mouthpiece jewelry—also known as grillz—and placed it on a nearby table. While Kenwyn slept, a man named Kein Eastman stopped by the apartment to collect some paperwork. Kenwyn later awoke to find his grillz missing and believed that Eastman had stolen it.

Kenwyn left the apartment, climbed into a gray Dodge Durango, and drove to Eastman's grandmother's house, where Eastman had been staying. Kenwyn found Eastman there and accused him of taking the grillz. Kenwyn then forced Eastman into the Durango at gunpoint, demanding he return to the apartment and find the missing jewelry. Eastman's ensuing search came up empty. Low on patience, Kenwyn then borrowed a cellphone and called his brother, Kendrick.

Kendrick arrived at the apartment twenty minutes later, and the situation escalated. The two brothers spoke outside for a few minutes and then entered the apartment together, from there kicking in the door to the bathroom where Eastman, his young son, and the son's mother were hiding. The

brothers forced Eastman downstairs, dragged him outside at gunpoint, threatened him, told him to lie on the ground, and kicked him. Kendrick then fired one downward shot, leaving Eastman to stumble away, moaning with his face bloodied. Kendrick and Kenwyn got into the gray Dodge Durango and drove away. A Ring doorbell positioned next to the apartment's front door recorded much of these events on camera.

Fast forward two hours. Emergency services dispatched the East St. Louis Fire Department to put out a car fire on a city street. Firefighters arrived only to find a gray Dodge Durango—the one Kendrick and Kenwyn drove hours earlier—burned to the frame. An associate of Kenwyn, Edward Molton, had rented the Durango. And in the hour leading to the 911 call reporting the fire, phone records show calls from Molton to Kenwyn and a separate call to the police in which Molton reported the Durango stolen.

In time a federal indictment charged Kendrick and Kenwyn with one count of kidnapping in violation of 18 U.S.C. § 1201(a)(1). A magistrate judge appointed separate counsel for both men, and attorney Beau Brindley then moved to be substituted as retained counsel for both Kenwyn and Kendrick. After conducting a hearing, the district court declined to permit the joint representation but did allow Mr. Brindley to serve as counsel for Kenwyn. Kendrick then retained his own attorney, Vadim Glozman.

The Fraziers moved to dismiss the indictment, contending that the federal kidnapping statute is unconstitutional as applied to kidnappings involving solely intrastate use of an instrumentality of interstate commerce. The district court denied the motion and the case proceeded to trial.

The jury returned guilty verdicts as to both Kendrick and Kenwyn. The brothers reacted by moving for a judgment of acquittal or a new trial pursuant to Federal Rules of Criminal Procedure 29 and 33. As relevant here, they challenged the sufficiency of the evidence to support their convictions and claimed the district court denied Kendrick's right to his choice of counsel, Mr. Brindley. The district court denied the motion.

At sentencing, over the Fraziers' objections, the district court found that Eastman sustained permanent or life-threatening bodily injury and accordingly applied a four-level enhancement pursuant to § 2A4.1(b)(2)(A) of the U.S. Sentencing Guidelines. The district court then calculated an advisory Guidelines range of 262–327 months' imprisonment for Kendrick and varied his sentence upward to 396 months. As for Kenwyn, the court calculated a range of 292–365 months' imprisonment and sentenced him to 365 months.

These appeals followed.

## II. Sixth Amendment Right to Choice of Counsel

We begin with the challenge to the district court's decision declining to permit Kendrick to proceed with Beau Brindley as his trial counsel. Because Mr. Brindley represented Kenwyn at trial, it is only Kendrick that challenges the denial of his right to his choice of counsel on appeal.

A

The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right … to have the Assistance of Counsel for his defence." This guarantee includes the right of a criminal defendant who does not require appointed counsel to choose the attorney who will represent him. See *United States v. Gonzalez-Lopez*, 548 U.S. 140, 146

(2006). But a defendant's right to his choice of counsel is not absolute. Where the defendant hires an attorney who has a conflict of interest, the defendant's choice of counsel may have to give way to ensure he receives a fair trial. See *Wheat v. United States*, 486 U.S. 153, 158–63 (1988).

The same lawyer representing more than one criminal defendant, the Supreme Court has cautioned, "engenders special dangers." *Id*. at 159. "Joint representation may present a conflict so concrete and serious that it intolerably undermines the right to effective assistance of counsel and justifies overriding the defendant's choice of counsel." *United States v. Turner*, 594 F.3d 946, 951 (7th Cir. 2010). So a court confronted with a case of joint representation "must take adequate steps to ascertain whether the conflicts warrant separate counsel." *Wheat*, 486 U.S. at 160. The Federal Rules of Criminal Procedure sound the same caution:

> The court must promptly inquire about the propriety of joint representation and must personally advise each defendant of the right to the effective assistance of counsel, including separate representation. Unless there is good cause to believe that no conflict of interest is likely to arise, the court must take appropriate measures to protect each defendant's right to counsel.

Fed. R. Crim. P. 44(c)(2).

Yet not all instances of joint representation give rise to a conflict of interest warranting disqualification of counsel. Because "a possible conflict inheres in almost every instance of multiple representation," *Cuyler v. Sullivan*, 446 U.S. 335, 348 (1980), the Supreme Court has made clear that only an actual

or serious potential conflict will justify overriding the defendant's choice of counsel, see *Wheat*, 486 U.S. at 164. The district court, therefore, must "determine the specific nature of any actual or potential conflict of interest arising from the joint representation." *Turner*, 594 F.3d at 952. Where the trial court "finds an actual conflict of interest," the Supreme Court has emphasized, "there can be no doubt that it may decline a proffer of waiver, and insist that defendants be separately represented." *Wheat*, 486 U.S. at 162.

The disqualification decision becomes more difficult where the joint representation presents only a potential for conflict. To ensure that the potential conflict "justif[ies] overriding the defendant's choice of counsel," courts must "inquir[e] into the likelihood that the potential conflict will mature into an actual conflict and the degree to which it threatens the right to effective assistance of counsel." *Turner*, 594 F.3d at 952. Accordingly, we have instructed district courts to evaluate "(1) the likelihood that the conflict will actually occur; (2) the severity of the threat to counsel's effectiveness; and (3) whether there are alternative measures available other than disqualification that would protect the defendant's right to effective counsel while respecting his choice of counsel." *Id.* "The first inquiry," we have explained, "is the most important" because "a conflict that would seriously undermine counsel's effectiveness is not a basis for disqualification if it has little likelihood of occurring." *Id.*

The decision to disqualify counsel is "left primarily to the informed judgment of the trial court," with the trial judge being "allowed substantial latitude in refusing waivers of conflicts of interest." *Wheat*, 486 U.S. at 163–64. We afford great deference to the district court because of its proximity to the

proceedings and its position to see and assess everything playing out before it. Our review, then, is only for abuse of discretion. See *Turner*, 594 F.3d at 951. And the proper analysis must take care to avoid the distortion of hindsight: "if disqualification was proper on the basis of all information known or knowable at the time the judge acted," there is no such abuse, as we have underscored that "later developments … [will] not spoil the decision." *Rodriguez v. Chandler*, 382 F.3d 670, 672 (7th Cir. 2004); see also *Wheat*, 486 U.S. at 162 (recognizing that "[t]he likelihood and dimensions of nascent conflicts of interest are notoriously hard to predict" and a district court must pass on the issue "not with the wisdom of hindsight after the trial has taken place, but in the murkier pre-trial context when relationships between parties are seen through a glass, darkly").

B

We find no abuse of discretion here. To the contrary, the record reflects that the district court handled Kendrick's Sixth Amendment right to counsel.

At the outset the magistrate judge appointed different attorneys to represent Kendrick and Kenwyn. Upon Beau Brindley's motion to be substituted as joint retained counsel, the district court scheduled a hearing and ordered Mr. Brindley to file conflict waivers and a supporting memorandum. Prior to the hearing the court appointed separate counsel, Talmage Newton, to advise the Fraziers on the potential for conflicts of interest arising from a joint representation by Mr. Brindley.

At the hearing itself the district court first heard from Kendrick and Kenwyn. An attorney from Mr. Brindley's law

firm questioned both brothers, as did the government and district court itself. The court inquired about each defendant's understanding of a conflict of interest and how any conflict might affect their rights, including at trial. The district court then asked all counsel, including for the government, about the likelihood that an actual conflict might arise and the appropriate course of action if it did.

At the conclusion of the hearing, and in a written order that followed, the district court denied the motion to substitute Mr. Brindley as joint counsel. The district court emphasized that the prosecution remained in its early phases and expressed concern and uncertainty about how subsequent stages may unfold. The court saw several aspects of the case as presenting a likelihood that serious potential conflicts of interest would arise between Kendrick and Kenwyn, rendering Mr. Brindley's joint representation of both brothers untenable.

What concerned the district court most was the government's ongoing investigation of Kein Eastman's disappearance. As the district court looked forward, it saw a possibility that the discovery of additional evidence could lead the government to seek a superseding indictment charging one or both brothers with murder. But the district court was also aware that Kenwyn was the brother who initiated the kidnapping yet Kendrick alone was the gunman—factual differences perhaps suggesting the Fraziers were not equally culpable. Different degrees of culpability, the district court worried, could create an incentive for one brother to choose to cooperate with the government. And the prospect of one brother testifying against another—with both represented by the same counsel—would result in an intolerable circumstance, with

the court seeing grave risk of one or another defendant not being able to receive effective, conflict-free advice from Mr. Brindley.

These possibilities left the district court concerned that a serious potential for conflict loomed on the horizon. Relying on the framework supplied by the Supreme Court in *Wheat* and our court in *Turner*, the district court then took care to make a record explaining why it saw risk that an actual conflict would emerge. The district judge viewed the risk of conflict as "so pervasive" that it could potentially "cause a mistrial" or "affect the integrity of how people view what happens in th[e] courtroom." And the district court emphasized that proceeding with a joint representation "may end up being a life or death decision"—alluding, as Mr. Newton acknowledged at the hearing, to the possibility that developments in the government's ongoing investigation could lead to death-eligible charges being added before trial. Indeed, the day after entering its order, the district court appointed an additional attorney for Kendrick, finding that the case involved "very difficult issues" which made additional counsel "necessary and in the interest of justice."

The district court made this decision early in the proceedings—more than 18 months before trial and with no way to know what the future would bring. Would the government's ongoing investigation uncover evidence turning a kidnapping case into a capital murder prosecution? If the death penalty entered the mix, would one brother seek to cooperate to spare his own life? Would either want to testify in their own defense? Faced with these questions, in circumstances so uncertain, we cannot say that the district court abused its discretion in declining to allow a joint representation to go forward.

In no way was it lost on the district judge that the defendants are brothers. That relationship, and the emotion and loyalties it typically engenders, undoubtedly made this court's decision more complex and difficult. To be sure, Kendrick and Kenwyn were charged and going to be tried not as brothers, but as individuals. And they have individual rights—including the right to the effective assistance of counsel. So we do not suggest that this fact should always preclude familial joint representations or even that it necessarily points in either direction here. Our more limited observation is that the Fraziers' bond of literal brotherhood is a circumstance warranting acknowledgment in our deferential review of the district court's handling of a delicate and difficult decision.

Kendrick sees the analysis differently and urges that our decision in *Turner* requires us to vacate his conviction and remand for a new trial. But the district court there had based its decision to disqualify counsel on the mere possibility that one of the defendants could decide to cooperate with the government. See *Turner*, 594 F.3d at 955. "This possibility," we explained, "exists in nearly all cases of joint representation. As such, the court applied what amounts to a per se rule against joint representation, which is contrary to *Wheat*." *Id.* (citation omitted).

Not so here. The district court considered *Turner* in analyzing the nature of the potential conflict. And the court acknowledged that "potential cooperation alone is not grounds for overriding a waiver." So while the district court did recognize the government's representation that cooperation was "not off the table," this comprised merely one among several grounds that informed the decision to deny Mr. Brindley's motion for joint representation.

We also highlighted in *Turner* that the district court entered its disqualification order "without making any personal inquiry of [the defendant]," which "inhibited the court's ability to fully assess the risk that a conflict would actually arise and evaluate whether other protective measures short of disqualification were available." 594 F.3d at 954. In no way did the district court make the same error here. Far from it. Only after appointing separate counsel, conducting a hearing, questioning the Fraziers and their counsel, and considering the gravity of the circumstances, did the district court deny the Frazier brothers' request for joint representation by Mr. Brindley.

Perhaps another district judge may have allowed the joint representation to proceed, but "that does not mean that one conclusion was 'right' and the other 'wrong.'" *Wheat*, 486 U.S. at 164. "The evaluation of the facts and circumstances of each case," the Supreme Court has underscored, "must be left primarily to the informed judgment of the trial court." *Id.* We will not second guess the district judge's reasonable and informed decision made in difficult circumstances, with close proximity to the dynamics of the case as they stood at the time. In the final analysis, then, we conclude that the district court did not violate Kendrick's Sixth Amendment right to his choice of counsel.

C

One more point requires attention. Kendrick contends he clearly expressed a preference for Mr. Brindley to represent him—even if the joint representation created a risk of conflict. In short, Kendrick claims that he had a right to retain Mr. Brindley as his counsel and did so with full awareness of the conflict-of-interest considerations that concerned the district

court. He sees the district court as having committed error in finding that he did not knowingly and intelligently waive his right to conflict-free counsel.

Here, too, we see no error—legal or factual. We review waivers of the right to counsel without any deference, but we do defer to the district court on its credibility determinations. See *United States v. Vizcarra-Millan*, 15 F.4th 473, 494 (7th Cir. 2021); *United States v. Balsiger*, 910 F.3d 942, 951–52 (7th Cir. 2018).

After conducting the substitution-of-counsel hearing, the district court expressed concern that "[n]either defendant could explain in his own words, even on a basic level, what they were giving up by waiving their rights to conflict-free counsel or what risks were involved in such a decision." The district court further observed that the Fraziers' "body language, hesitations, tones, and demeanors in the courtroom strongly suggested that their waivers were not knowing or intelligent." It also understandably troubled the district court that Mr. Brindley failed to comply with the order to file written conflict waivers.

We are hesitant to set aside the district court's credibility determinations. The court handled the entirety of the joint representation request with care at every step.

### III. Constitutionality of Federal Kidnapping Statute

That brings us to Kendrick's and Kenwyn's challenges to the constitutionality of the federal kidnapping statute. The brothers contend that their use of the Dodge Durango and cellphones never included the crossing of any state line—everything happened in East St. Louis, Illinois—and so could not satisfy the interstate commerce element of 18 U.S.C.

§ 1201(a)(1). Purely intrastate use of these instrumentalities of commerce, the argument goes, is beyond Congress's authority and cannot support federal criminal charges. Our precedent forecloses this position.

Where Congress elects to regulate instrumentalities of commerce, we have emphasized that "federal jurisdiction is supplied by the nature of the instrumentality or facility used, not by separate proof of interstate movement." *United States v. Richeson*, 338 F.3d 653, 660–61 (7th Cir. 2003) (quoting *United States v. Marek*, 238 F.3d 310, 317 (5th Cir. 2001)). Even more, we recently rejected the Fraziers' precise challenge in upholding a conviction under the federal kidnapping statute. See *United States v. Protho*, 41 F.4th 812, 828–29 (7th Cir. 2022). It is "the *nature* of the regulated object's class (here, automobiles)," we explained, "rather than the particular *use* of one member of that class ([the defendant's] Ford Explorer) that matters." *Id.* at 828.

Likewise with the Dodge Durango and cellphones used by Kendrick and Kenwyn. There is no question cars and cellphones are instrumentalities of interstate commerce. Aligned with our precedent, we conclude that the federal kidnapping statute is constitutional as applied to the Fraziers' conduct.

**IV. Sufficiency of Evidence**

We come next to the challenge to the sufficiency of the trial evidence. While both brothers filed a post-trial motion for a judgment of acquittal, only Kendrick contends on appeal that the government's evidence did not support the jury's verdict.

A

The federal kidnapping statute makes it a crime to:

> unlawfully seize[], confine[], inveigle[], decoy[], kidnap[], abduct[], or carr[y] away and hold[] for ransom or reward or otherwise any person … when … the person is willfully transported in interstate or foreign commerce … or the offender travels in interstate or foreign commerce or uses the mail or any means, facility, or instrumentality of interstate or foreign commerce in committing or in furtherance of the commission of the offense.

18 U.S.C. § 1201(a)(1).

Adhering to our pattern instructions, the district court informed the jury that to sustain a conviction for kidnapping, the government had to prove beyond a reasonable doubt that Kendrick (1) unlawfully seized, confined, kidnapped, abducted, or carried away Kein Eastman without his consent; (2) held Eastman for any purpose; and (3) used a facility or instrumentality of interstate or foreign commerce in committing or in furtherance of the commission of the offense. See *William J. Bauer Pattern Criminal Jury Instructions of the Seventh Circuit*, at 614 (2023 ed.).

The district court added that a person may also be found guilty of an offense by aiding and abetting the commission of the offense. See 18 U.S.C. § 2. To find Kendrick guilty of kidnapping on this basis, the district court explained, the government had to prove that (1) the crime of kidnapping was committed; (2) Kendrick participated in the criminal activity and tried to make it succeed; and (3) Kendrick did so knowingly. See *William J. Bauer Pattern Criminal Jury Instructions of the Seventh Circuit*, at 95; see also *United States v. Rivera*, 901 F.3d 896,

901 (7th Cir. 2018) (citing *Rosemond v. United States*, 572 U.S. 65, 134 (2014)).

In reviewing the denial of a Rule 29 motion for a judgment of acquittal, we apply the same standard as the district court. The overarching question is whether sufficient evidence supported the jury's verdict. See *United States v. Dewitt*, 943 F.3d 1092, 1096 (7th Cir. 2019). In undertaking this inquiry, we "consider the evidence in the light most favorable to the Government," and will reverse "only when the record contains no evidence, regardless of how it is weighed, from which the jury could find guilt beyond a reasonable doubt." *United States v. Blassingame*, 197 F.3d 271, 284 (7th Cir. 1999) (quoting *United States v. Moore*, 115 F.3d 1348, 1363 (7th Cir. 1997)). Reversal under this standard, we have emphasized, is a "nearly insurmountable hurdle." *United States v. Garcia*, 919 F.3d 489, 496 (7th Cir. 2019) (citation omitted).

B

We begin with a basic observation: a kidnapping happened here. Kenwyn abducted Eastman from his grandmother's house at gunpoint, took him in the Dodge Durango—an instrumentality of interstate commerce—back to the apartment, and held Eastman there for more than an hour as Kenwyn demanded that Eastman find the grillz. This evidence supported Kenwyn's conviction for violating § 1201(a)(1) beyond any question. Indeed, Kenwyn does not challenge the sufficiency of the government's evidence on appeal.

As to Kendrick, the parties spend a lot of time debating the different theories of criminal liability that the government put before the jury. But because the jury had a more than

sufficient basis to find that Kendrick aided and abetted Kenwyn in kidnapping Eastman, we affirm his conviction on that ground alone. We need not analyze the range of other alternative theories of guilt.

Viewing the evidence, as we must, in the light most favorable to the government, the jury easily could have found that Kenwyn called Kendrick—seeking his help forcing Kein Eastman to find and turn over the grillz. The call lasted 37 seconds and Kenwyn can be heard on video asking, "Where you at?" Approximately twenty minutes later Kendrick arrived at the East St. Louis apartment complex. The video shows that the two brothers stood outside and talked for several minutes before entering the apartment. Once inside, as one witness testified, Kendrick banged on the door to the bathroom where Eastman hid, yelling at him to open it. When Eastman refused, Kendrick busted the door off its hinges. He then dragged Eastman at gunpoint out the front door of the apartment by his shirt collar. Kendrick threatened Eastman and demanded, "take us to our shit." But Eastman claimed he did not have the grillz. Kendrick then asked Eastman why he was playing around. When Eastman again claimed to not have the grillz, Kendrick told him to lie on the ground, kicked him, and fired his weapon in a downward direction. The jury saw and heard all of this from the Ring camera recording.

Based on Kenwyn's phone call, Kendrick's going to the apartment, and the conversation between the two brothers in the front yard, a reasonable jury could infer Kendrick knew that his brother was holding Eastman inside. Kendrick then willfully joined and participated in the ongoing offense: he entered the apartment and, within a matter of minutes, held a gun to Eastman's head while demanding return of the

grillz—the purpose of the kidnapping. On this evidence, the jury could further conclude that Kendrick not only "'associate[d] himself with the venture,' but also … '[sought] by his action to make it succeed.'" *Rosemond*, 572 U.S. at 76 (quoting *Nye & Nissen v. United States*, 336 U.S. 613, 619 (1949)).

Kendrick's only response is to say other conclusions are possible and that the evidence was too circumstantial to support his conviction for kidnapping. But that line of argument fails to account for the highly deferential standard governing our review of a jury's verdict. The trial record contained sufficient evidence that Kendrick knowingly showed up to an ongoing kidnapping and then acted to further it and help it succeed. We see no grounds to second guess the jury's verdict on appeal.

## V. Evidentiary Challenges

We arrive next at Kendrick's and Kenwyn's challenges to evidence admitted at trial. The Fraziers argue that the district court should not have allowed the jury to hear evidence of what happened after Eastman stumbled away from the apartment complex following the gunshot. In particular, Kendrick and Kenwyn object to the testimony that they pursued Eastman in the Dodge Durango, the pictures of the burned vehicle, and the call logs and cellular location information (or cell-site data) documenting Kenwyn's phone calls in the time frame leading up to the Durango fire. They see this evidence as having no relevance and, at the very least, being unfairly prejudicial. Here, too, we disagree.

### A

Evidence is relevant where it "has any tendency to make a fact more or less probable than it would be without the

evidence" and "the fact is of consequence in determining the action." Fed. R. Evid. 401. While relevant evidence is generally admissible, a district court may exclude evidence whose probative value "is substantially outweighed by a danger of … unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403.

Our review of a district court's evidentiary rulings is limited. We ask only whether those rulings reflected an abuse of discretion, and we will not reverse if the error was harmless. See *Narkiewicz-Laine v. Doyle*, 930 F.3d 897, 901 (7th Cir. 2019). "A trial judge," we have emphasized, "has wide latitude in ruling on relevancy and materiality." *United States v. Marlin*, 471 F.2d 764, 766 (7th Cir. 1972). And "[w]hen we review the context-sensitive application of Rule 403, 'we give special deference' to the district court's findings and reverse only when 'no reasonable person could take the view adopted by the trial court.'" *United States v. Johnson*, 89 F.4th 997, 1002 (7th Cir. 2024) (quoting *United States v. LeShore*, 543 F.3d 935, 939 (7th Cir. 2008)).

For its part, the government urges us to review only for plain error, contending that the Fraziers failed to make a timely objection at trial to preserve these evidentiary issues for appeal.

We have a difficult time seeing the Fraziers' evidentiary objections as preserved. We acknowledge the Fraziers raised an objection to evidence of the Durango fire and evidence that they held Eastman in the vehicle after he fled the apartment complex. But the brothers did so in their joint motion for mistrial, filed after the second day of trial, arguing that the government's presentation of such evidence amounted to a

constructive amendment of the indictment—resulting in violation of their Fifth and Sixth Amendment rights. Both the Fraziers' written motion and counsel's oral argument relied exclusively on constitutional grounds: they did not present an independent objection to the evidence based on relevance or unfair prejudice. Further, counsel did object at trial to testimony that the burned Dodge Durango had been recovered—but the basis for the objection is not clear from the trial transcript.

If we had to decide, we would be inclined to review only for plain error. See *United States v. Echols*, 104 F.4th 1023, 1028–29 (7th Cir. 2024) (explaining that a party "cannot cast an objection at too high a level of generality" or "preserve one specific objection by making a different specific objection in the trial court"). But ultimately it does not matter whether the Fraziers properly preserved the objection because we find that the district court committed no error in the first instance.

B

Remember what the evidence showed: Kenwyn abducted Kein Eastman from his grandmother's home, both brothers physically removed Eastman from the East St. Louis apartment, and Kendrick fired his weapon in a downward direction while Eastman was on the ground. Evidence suggesting Kendrick and Kenwyn then followed or chased Eastman and held him in the Dodge Durango bears directly on two elements of federal kidnapping that the government needed to prove at trial: an unlawful holding and use of an instrumentality of interstate commerce in furtherance of the kidnapping. The evidence in question, then, meets the low bar for relevance.

But even if the government could not prove that the Fraziers continued the kidnapping once Eastman fled the apartment complex, Kenwyn unquestionably used the Durango as a part of the kidnapping earlier that day. The testimony of multiple witnesses and the Ring video established that Kenwyn took Kein Eastman from his grandmother's house and brought him to the apartment in the Durango. That the fire department recovered the same vehicle burned to its frame just hours later—after witnesses saw Kendrick and Kenwyn drive away in the car—bears on the Fraziers' consciousness of guilt. Such evidence is relevant as circumstantial evidence of guilt. See, *e.g.*, *United States v. Kuehne*, 547 F.3d 667, 691 (6th Cir. 2008) (holding that the district court properly admitted evidence of a criminal defendant's attempt to tamper with evidence as probative of consciousness of guilt); *United States v. Castillo*, 615 F.2d 878, 885 (9th Cir. 1980) (explaining that any "attempt by a criminal defendant to suppress evidence is probative of consciousness of guilt and admissible on that basis").

The Fraziers have further failed to demonstrate that evidence of the Durango fire or evidence that the kidnapping continued after the gunshot should have been excluded due to unfair prejudice. Much of what happened on August 13, 2020 is tragic and shocking: Eastman was abducted, held at gunpoint, threatened, beaten, and shot at. All of this happened at an apartment where his young son and the son's mother were present. No doubt the testimony and video evidence were difficult for the jury to review.

Against this backdrop, however, the evidence that the Fraziers challenge on appeal—testimony that they followed Eastman in the Durango, pictures of the burned Durango, and

records documenting Kenwyn's phone calls in the time frame leading up to the fire—cannot be said to have incrementally added to the prejudice of evidence necessary to prove a crime of this nature.

The Fraziers also urge that the evidence invited the jury to improperly speculate about what might have happened to Eastman after he left the apartment. But, pursuant to a motion in limine, the district court barred the government from presenting evidence or argument that Eastman is deceased. And there is nothing in the record to suggest the government failed to comply with that order. With the jury hearing no suggestion that Eastman is dead or missing—let alone that the Fraziers killed him in the Durango or used the fire to dispose of his remains—there is "nothing inherently emotional or incendiary" about evidence of the continued kidnapping and charred vehicle. *United States v. Strong*, 485 F.3d 985, 991 (7th Cir. 2007).

We see no error in allowing the jury to consider the challenged evidence.

**VI. Sentencing Enhancement**

We come, then, to Kendrick's and Kenwyn's sentencing challenges. In calculating the brothers' Guideline range, the district judge applied a four-level sentencing enhancement under U.S.S.G. § 2A4.1(b)(2)(A), finding that Eastman suffered a permanent or life-threatening bodily injury. This increased each brother's total offense levels and, in turn, their advisory sentencing ranges.

A

Section 2A4.1(b)(2)(A) of the Sentencing Guidelines provides that the base offense level for kidnapping may be

increased by four levels "[i]f the victim sustained permanent or life-threatening bodily injury." The Guidelines define these injuries in a way that specifically references the dangers posed by kidnapping:

> "Permanent or life-threatening bodily injury" means injury involving a substantial risk of death; loss or substantial impairment of the function of a bodily member, organ, or mental faculty that is likely to be permanent; or an obvious disfigurement that is likely to be permanent. *In the case of a kidnapping, for example, maltreatment to a life-threatening degree (e.g., by denial of food or medical care) would constitute life-threatening bodily injury.*

*Id.* § 1B1.1, cmt. 1(K) (emphasis added).

A district court's characterization of injuries under § 2A4.1(b)(2)(A) is a factual finding that we review for clear error. See *United States v. Brazier*, 933 F.3d 796, 802 (7th Cir. 2019). The court's factual findings must be supported by a preponderance of the evidence, see *United States v. Smith*, 210 F.3d 760, 762 (7th Cir. 2000), and we will not second guess those findings unless "we are left with the definite and firm conviction that a mistake has been made," *United States v. Burnett*, 37 F.4th 1235, 1239 (7th Cir. 2022). Our role on appeal "is not to see whether there is any view of the evidence that might undercut the district court's finding; it is to see whether there is any evidence in the record to support the finding." *United States v. Wade*, 114 F.3d 103, 105 (7th Cir. 1997).

B

Based on the Ring camera footage and witness testimony, the district court concluded that Kendrick shot Kein Eastman with a .45 caliber gun at close range, causing him to sustain a permanent or life-threatening injury. Whether the record supported the district court's finding is debatable. But, in the end, we cannot say the finding reflects clear error.

The Ring camera next to the entrance of the apartment captured Kendrick, with Kenwyn directly behind, pulling Eastman out the front door. Kendrick threatened Eastman, demanded he get on the ground, and fired his weapon downward in the direction of Eastman at point-blank range. The video does not show whether a bullet struck Eastman. But Kendrick's conduct, words, and clear sense of fear leading up to the gunshot do not suggest it was a mere warning shot. It portrays Kendrick giving Eastman one last chance to hand over the grillz. And when he refused, Kendrick forced him down to the sidewalk at gunpoint, only then—with Kendrick's arms pointed in a downward direction towards Eastman—to fire a shot.

Further, Eastman's demeanor and voice change after the gunfire. He immediately reacted to the blast by audibly moaning and groaning. He then struggled to get up and slowly stumbled out of the frame. All of this supports the district court's finding that the gunshot hit and injured Eastman.

There was other evidence too. Two witnesses saw Eastman after the shot rang out. Marcel Martin, a man who lived in the apartment complex, told the jury that he went outside to his front yard, saw Eastman getting up, and also saw (as Eastman ran by) that he was bleeding from his face and head.

As Martin explained, there "was a lot of blood from the right side of his face, the head area." Another neighbor, Diedra Hughes, also saw Eastman bleeding. She testified that Eastman "didn't get up quickly, but he got up and he was like slowly running." While neither observed the gunfire itself, the district court could have reasonably determined that this witness testimony supported a finding that Kendrick shot Eastman in the head.

Martin, Hughes, and yet another neighbor, Roshlia Charles, further described the trail of blood that Eastman left behind as he fled. Charles recounted how blood trickles extended across the sidewalks of no fewer than four apartments in the complex. She added that she watched Martin use a hose to spray blood off the sidewalks for "at least about 15 minutes." The video footage corroborates that testimony, showing a man hosing down the pavement outside the apartment while at one point saying that someone "got shot in the … face on my porch." Martin confirmed all of this at trial.

The amount of blood left in the area where Eastman knelt informs, at least circumstantially, the extent of his injuries. Witnesses described the quantity of blood as "trickles" and "droplets," but the district court reasonably observed that it does not take fifteen minutes to hose off just drops of blood. Weighing the circumstantial evidence in the record, we are not left with "definite and firm conviction" that the district court committed any error in finding that Kendrick Frazier shot Kein Eastman in the head, leaving Eastman with a permanent or life-threatening injury from the resulting wound.

Kendrick and Kenwyn press an altogether different analysis. They do not contest the caliber of the weapon or that Kendrick fired a shot at close range. They instead insist that

the government presented no direct evidence the bullet actually struck Eastman and that, even if it had, evidence of a gunshot wound alone would be insufficient to establish the extent of Eastman's injuries in the absence of proof—medical records, photographs, or the like.

But the law does not require direct evidence regarding the nature of a victim's injury. Judges are allowed to rely on circumstantial evidence and common sense in determining whether a sentencing enhancement applies. See, *e.g.*, *United States v. Matthews*, 749 F.3d 99, 105 (1st Cir. 2014) ("Either direct or circumstantial evidence will do, with the sentencing court free to draw commonsense inferences from the evidence."). And the Fraziers fail to confront the full extent of the circumstantial evidence the district court had available in determining whether to apply the offense level enhancement under § 2A4.1(b)(2)(A).

Taking another tact, Kendrick and Kenwyn contend that Eastman's injuries could have occurred before the gunshot—during the violent fracas inside the apartment. They emphasize the testimony of witnesses who observed a "puddle of blood in the bathroom" of the apartment, "blood on the steps" going downstairs, and the kicking of Eastman several times before the gun sounded. If Eastman bled only from a physical altercation and not a bullet wound, the argument goes, it is speculative to conclude that he suffered any permanent or life-threatening injury. But the two are not mutually exclusive. To the contrary, the evidence fairly lent itself to the district court's finding that Eastman bled inside the apartment and suffered additional, substantial blood loss after sustaining a gunshot wound outside.

For the district court, it mattered that witnesses saw East-man bleeding after the gunshot rang out—so much so that one neighbor then spent 15 minutes hosing off the sidewalk. Coupled with the video evidence, we see no clear error in the court's ultimate finding that a gunshot caused Eastman per-manent or life-threatening injury—regardless of any other in-juries the Fraziers had inflicted leading up to that point.

To be sure, we agree with the Fraziers that this is a close question and that another district judge might have found the evidence to fall short of showing that Kein Eastman sustained a permanent or life-threatening injury during the kidnapping. But that is not the controlling question and, having taken a close look at the record before the district court, we see no clear error in the court's factual findings and, by extension, no error in its decision to impose a four-level enhancement under § 2A4.1(b)(2)(A) to Kendrick and Kenwyn's advisory Guide-lines ranges.

For the avoidance of doubt, we owe a final word to the sentencing enhancement as applied to Kenwyn specifically. The parties agree that Kenwyn did not pull the trigger. Yet the district court nevertheless applied the same enhancement to both brothers, finding that Kendrick's conduct should be imputed to Kenwyn under the Sentencing Guidelines. The Guidelines relevant conduct rule "provides district courts di-rection as to the scope of conduct appropriate for considera-tion at sentencing." *Burnett*, 37 F.4th at 1238 (citing U.S.S.G. § 1B1.3(a)). Where a defendant jointly undertakes criminal ac-tivity, the "relevant conduct" for sentencing purposes in-cludes all reasonably foreseeable acts within the scope of and in furtherance of the crime. See U.S.S.G. § 1B1.3(a)(1)(B).

The Fraziers jointly participated in the violent crime of kidnapping, and Kenwyn was an active participant at all times and in all relevant events. Further, the shooting occurred within the scope of the criminal activity, in furtherance of that activity, and was reasonably foreseeable in connection with it. Our conclusion that there is no infirmity with the district court's application of the sentencing enhancement, then, extends and applies in full to Kenwyn.

## VII. Conclusion

While not the outcome they wanted in our court, Kendrick and Kenwyn should know they were very ably represented on appeal.

With that closing observation, we AFFIRM.